545 F.2d 842
 Application of Dr. Frank Kacher for an Order staying Writs
of Replevin at Nos. 2966 and 2967 July Term, 1971, in the
Court of Common Pleas of Allegheny County, Pennsylvania, or
for a temporary Restraining Order until such time that a
hearing to test the constitutionality of the Writ of
Replevin may be effected.
Dr. Frank KACHER, an Individual
v.
PITTSBURGH NATIONAL BANK, a corporation.
Appeal of Dr. Frank A. KACHER.
 No. 75-2451.
 United States Court of Appeals, Third Circuit.
 Submitted Under Rule 12(6) June 8, 1976.
Decided Nov. 2, 1976.
 
 Bart M. Beier and Thomas M. Kerr, Kaufman & Harris, Pittsburgh, Pa., for appellant.
 Marten R. Jenkins, Campbell, Thomas & Burke, Pittsburgh, Pa., for appellee.
 Before VAN DUSEN, GIBBONS and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 The question presented in this appeal is whether a creditor which proceeds to enforce its security interest under state replevin procedures later declared to be unconstitutional is answerable in damages to a debtor whose property was seized and sold. The United States District Court for the Western District of Pennsylvania answered this question in the negative. We affirm.
 
 I.
 
 2
 Plaintiff Frank Kacher, a Pittsburgh dentist, borrowed $20,625 from the Pittsburgh National Bank ("Bank") to purchase certain dental equipment and fixtures for which loan he executed a note of even amount secured by a chattel mortgage on the aforesaid personal property. The Bank also held a Pennsylvania Motor Vehicle Installment Sale Contract executed by Kacher and secured by a Porsche automobile.
 
 
 3
 According to the Bank, after little more than a year Kacher had fallen behind in his payments. Therefore, on June 21, 1971, the Bank filed two complaints in replevin in the Court of Common Pleas of Allegheny County, Pennsylvania, and obtained two writs of replevin with bond to enforce its security interest in the dental equipment, fixtures, and automobile. The Sheriff of Allegheny County immediately executed the writs and in accordance with the existing Pennsylvania Replevin Statute and Rules of Civil Procedure took possession of most of the property. Kacher was allowed to retain four pieces of dental equipment, and he ultimately posted a counterbond for them.
 
 
 4
 Kacher then petitioned the court of common pleas to stay or set aside the writs of replevin until he could obtain a hearing, but the court denied his petitions as the Pennsylvania replevin statutes did not provide for such a hearing at that stage of the proceedings. Thereupon, on June 29, Kacher applied for a stay of the writs of replevin or a temporary restraining order from the United States District Court for the Western District of Pennsylvania. His petition alleged, inter alia, that his inability to secure a prior hearing denied him due process, that replevin procedures deprive those individuals unable to post counterbonds of equal protection of the law, and that seizure of the goods on his private property constituted an unreasonable search and seizure. The district court denied Kacher's motion, noting that it had no jurisdiction to restrain the replevin action.
 
 
 5
 Upon Kacher's motion for reconsideration, filed July 9, the district court agreed to hear oral argument. During the hearing, the district judge construed Kacher's application as a petition to convene a three-judge court pursuant to 28 U.S.C. § 2284 (1970) and to issue a temporary restraining order pending the decision of such court. The judge made an express finding "that there is no showing of any unconstitutional procedure" and denied the motion for a restraining order by order of July 16.
 
 
 6
 A three-judge court on March 31, 1971, had turned aside a challenge to Pennsylvania's replevin statutes which was mounted on grounds identical to those averred by Kacher. See Epps v. Cortese, 326 F.Supp. 127 (E.D.Pa.1971). The United States Supreme Court had noted probable jurisdiction of the appeal on May 24. 402 U.S. 994, 91 S.Ct. 2185, 29 L.Ed.2d 159 (1971). Under the circumstances, the district court understandably refused to find the Pennsylvania replevin procedures unconstitutional and to convene another three-judge court to consider the identical issues raised by Epps. Nonetheless, Kacher appealed to this court.
 
 
 7
 In the meantime, Kacher had ignored the replevin proceedings in the state court. Since he filed no counterbond and entered no defenses, on July 21, the court entered default judgments in replevin against him for the property which had been seized. The Bank subsequently sold the automobile on August 9 and the dental equipment and fixtures on October 14. In a counterclaim later filed in the district court, the Bank averred that after it had applied the proceeds from both sales to the total outstanding obligation, Kacher still owed $8,901.86 to the Bank. No part of this debt has apparently been paid.
 
 
 8
 Almost a month after the Bank's final sale of the repossessed property, on November 9, 1971, the United States Supreme Court heard argument in the appeal from the decision in Epps. Parham v. Cortese, 40 U.S.L.W. 2333-34 (U.S. November 16, 1971). Kacher's appeal in this court remained inactive until the Supreme Court on June 12, 1972, handed down its decision holding the Pennsylvania and Florida replevin statutes unconstitutional. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Following that decision, Kacher moved in this court for summary reversal and requested that the case be remanded for a determination of damages "and for such additional relief which this Court believes is just and proper." The ex parte motion was unopposed and a panel of this court ordered the motion "granted" on August 29, 1972. The panel did not, as the dissent implies, pass upon the merits of any claim for damages.[1]
 
 
 9
 The remand generated no small amount of confusion in the district court. The order from which Kacher had appealed and which was summarily reversed was merely the district judge's denial of his motion to restrain the replevin proceedings. As those proceedings had long since advanced to completion with the sale of the replevied property, no purpose would have been served for the district court to enter an order staying those proceedings pursuant to this court's reversal and remand. Furthermore, as Kacher's complaint had stated no claim for damages, this court's remand for determination of damages was apparently premature.
 
 
 10
 The district judge, however, attempted to comply with this court's order, which he termed "cryptic," by requiring Kacher to file an amended complaint for damages. Kacher complied by filing a complaint alleging that the Bank had taken his property in violation of the fifth and fourteenth amendments, that the Bank had no right to possession of the goods, and that the Bank had sold the goods without notice of the sale or of its time or place.
 
 
 11
 The complaint set forth the following items of damages:
 
 
 12
 A. Loss of income commencing June 15, 1971, to the present.
 
 
 13
 B. Loss of (Kacher's) professional and business reputation.
 
 
 14
 C. Slander in the presence of persons in the community.
 
 
 15
 D. Frustration, humiliation, and emotional strain and physical injury.
 
 
 16
 E. Loss of the cost of the goods replevied and sold.
 
 
 17
 After discovery was completed, the district judge once more reviewed the record in this case "(i)n an attempt to create order out of chaos." He decided that a trial on the sole issue of damages was premature, and consequently vacated his order that Kacher file an amended complaint, treating all pleadings filed thereafter as "nullities." In fairness to Kacher, however, the judge stated that he would treat the amended complaint for damages as a civil rights action under 42 U.S.C. § 1983 (1970) and directed Kacher to amend the complaint accordingly.
 
 
 18
 The newly amended complaint, filed August 7, 1974, averred that jurisdiction was conferred by, inter alia, "the Civil Rights Act" and alleged that the Bank had "no right at law to repossess either (Kacher's) dental office equipment and fixtures or his automobile until such time that a due-process hearing . . . had been provided to him." The complaint further charged the Bank with selling the repossessed goods "without either a notice of the sale or a notice of the right of plaintiff to redeem."
 
 
 19
 Injury to Kacher allegedly stemmed from his loss of the use of the goods and "in having his business and professional reputation and dental practice permanently damaged due to the replevin without a due-process hearing." The complaint sought punitive damages of $100,000 in addition to compensatory damages.
 
 
 20
 The Bank, in response to the newly amended complaint, filed motions for summary judgment or to dismiss the complaint. Kacher then filed a petition in this court for a writ of mandamus or prohibition, claiming that the district court was obstructing enforcement of this court's order of August 29, 1972. This court denied his petition,1A and Kacher thereupon appealed to the United States Supreme Court, which dismissed his appeal and treating it as a petition for a writ of certiorari, denied the petition.
 
 
 21
 On his return to the district court, Kacher filed a petition for mandatory disqualification of the district judge who had been presiding over this case from its inception. The case was reassigned to another district judge, who heard argument and granted the Bank's motion to dismiss the complaint.
 
 
 22
 The district court framed the issue before it in terms of the retroactivity of the Fuentes decision. Adhering to the guidelines laid down in Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the court reasoned that creditors and attorneys who had relied on the validity of the Pennsylvania replevin procedures before Fuentes were justified in so doing and should not be penalized thereafter. Moreover, it expressed the view that applying Fuentes retroactively was not necessary to further its underlying rationale and that, indeed, such an application would "work an injustice upon those, such as (the Bank), who acted in accordance with a time honored and court tested proceeding."
 
 
 23
 There is ample precedent for a refusal to apply Fuentes retrospectively to invalidate replevin proceedings begun before the date of the decision.[2] See, e. g., Douglas-Guardian Warehouse Corporation v. Posey, 486 F.2d 739, 742 (10th Cir. 1973); Ruotolo v. Gould, 489 F.2d 1324 (1st Cir. 1974); McIntyre v. Associates Financial Service Co., 328 N.E.2d 492, 495 (Mass.1975). Giving Fuentes a retroactive effect is not only harsh and impractical, but as Justice Clark, sitting by designation, in Douglas-Guardian Warehouse Corporation v. Posey, supra, 486 F.2d at 742, incisively stated, "a retroactive application of Fuentes v. Shevin, supra, would work an injustice and a hardship upon (parties) who have lawfully acquired vested rights in the form of their state judgments." Indeed, most state and federal courts which have been called upon to strike down specific state statutory schemes under Fuentes specify that their own holding of invalidity is prospective only. See, e. g., Bay State Harness Horse R. & B. Ass'n v. PPG Industries, Inc., 365 F.Supp. 1299, 1307 (D.Mass.1973) (three-judge court); Trapper Brown Construction Co. v. Electromech, Inc., 358 F.Supp. 105, 108 (D.N.H.1973) (three-judge court); Gunter v. Merchants Warren National Bank, 360 F.Supp. 1085, 1091 (D.Me.1973) (three-judge court); Hampton National Bank v. Desjardins, 114 N.H. 68, 314 A.2d 654, 658 (1974).
 
 
 24
 As a consequence, a number of courts have not only refused to apply Fuentes retroactively but have let stand attachments and other results of unconstitutional state procedures obtained after Fuentes had cast doubt on those procedures but before a judicial decision invalidating the particular state statutory scheme in question. See, e. g., Ruotolo v. Gould, supra; Cranston v. Commercial Chemical Corp., 324 A.2d 301, 303 (Me.1974). Parties are thereby permitted to rely on state statutory procedures even after a United States Supreme Court decision has rendered them highly suspect. They are apparently not deemed to have been put on notice that the procedures they invoke may themselves be invalidated in a short time. Furthermore, creditors are allowed to retain the results of their lawful use of the statutory structure even when the debtor's goods or assets have not already been disposed of, as here.
 
 
 25
 A fortiori, where a three-judge court placed its imprimatur on a statutory scheme just several months before a creditor invoked the statutory procedures, Fuentes should not be applied retroactively to penalize the creditor. We would not, moreover, require a creditor to await the outcome of an appeal from the decision upholding the statutes upon which it seeks to rely. In this case, the result of the appeal in Epps was not as "clearly foreshadowed" as the dissent would suggest. Three of the seven Supreme Court justices who participated in the Fuentes decision would have upheld the Pennsylvania replevin procedure as consistent with due process. Thus, the mere appeal from Epps was insufficient to charge the Bank with a duty not to proceed under the state's replevin statutes.
 
 
 26
 Although the district court found the non-retroactivity of Fuentes dispositive, Kacher's amended complaint presents a different, albeit related, issue. Kacher's amended complaint did not seek to dissolve the writ of replevin or to recover the replevied goods but rather sought damages for the Bank's use of the replevin procedures. The present action is thus not for injunctive relief or for "money damages incidental to equitable relief," as the dissent characterizes it. With the pleadings in this posture, we must decide whether section 1983 confers on plaintiff a right to recover money damages from a party who invoked a state statutory scheme which had not then been held unconstitutional, a claim which virtually attacks collaterally the unappealed-from replevin judgment of the state court. Even in the context of a section 1983 claim, we believe the non-retroactivity of Fuentes is dispositive.
 
 
 27
 Furthermore, we know of no case in which such a claim for damages has been successful. The Courts of Appeals for the Second and Tenth Circuits have decided this question resoundingly in favor of defendants. In Rios v. Cessna Finance Corporation, 488 F.2d 25 (10th Cir. 1973), the court unequivocally held: "(D)amages are not collectible in a civil right action against one who followed a statutory procedure presumed to be constitutional." Id. at 28.
 
 
 28
 The Second Circuit, in Tucker v. Maher, 497 F.2d 1309 (2d Cir. 1974), couched its analysis in terms of the analogous common law tort of malicious prosecution, following the approach of Justice Brennan in Adickes v. S. H. Kress & Co., 398 U.S. 144, 231-33, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). As the plaintiff in a tort action for malicious prosecution must establish improper motive on the part of the defendant, so must a plaintiff asserting the analogous section 1983 claim. The defendants in Tucker, as the Bank here, "apparently acted on the advice of counsel (in attaching the plaintiff's property) and no evil intent can be properly ascribed to them." Id. at 1315. As to counsel, the Tucker court stated that "attorneys should be entitled to rely upon the presumption of constitutionality. Certainly their dependence upon a statute later found vulnerable is not to be equated with the malevolent intent basic to this particular tort." Id. at 1316.
 
 
 29
 In a different context involving a more cherished right deprivation of liberty a district court refused to award damages to a plaintiff who was committed under a constitutionally defective statute which had not at the same time been invalidated. Chesney v. Adams, 377 F.Supp. 887 (D.Conn.1974). See also Fleming v. McEnany, 491 F.2d 1353, 1359 (2d Cir. 1974) (applying Vermont law).
 
 
 30
 Section 1983 liability, although the statute itself sweeps broadly, has been limited in a number of United States Supreme Court decisions by importing general principles of common law tort defenses. E. g., Imbler v. Pachtman, 424 U.S. 409, 418, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); Pierson v. Ray, 386 U.S. 547, 554-55, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). This court too has required that the culpability of the defendant, in traditional tort terms, be established.
 
 
 31
 (A)lthough proof of specific intent to deprive a person of his federally protected rights is not required, there must be at least proof of the "condition usually demanded by the law for liability in an action of tort (which) is the existence of either wrongful intention or culpable negligence on the part of the defendant." (Citation omitted.)
 
 
 32
 Howell v. Cataldi, 464 F.2d 272, 279 (3d Cir. 1972).
 
 
 33
 In the instant case, there has been no allegation that the Bank acted with wrongful intent or for an improper purpose in invoking the replevin statutes to collect a debt indisputably past due. Since the Bank's actions lack that essential ingredient of tort liability at common law, the unhappy target of its replevin proceedings may not hold the Bank answerable in damages under section 1983.
 
 
 34
 The judgment of the district court will be affirmed.
 
 GIBBONS, Circuit Judge (dissenting):
 
 35
 On October 13, 1969 Frank Kacher, a dentist, borrowed $20,625 from the Pittsburgh National Bank to purchase dental equipment. Kacher executed a judgment note for that sum and a chattel mortgage giving the bank a security interest in the dental equipment and a Porsche automobile. On June 9, 1969 the Supreme Court decided Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), holding that the notice and hearing requirements of Schroeder v. New York, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962) and Mullane v. Central Hanover Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) were applicable to deprivations of property interests by garnishment. On March 23, 1970 the Supreme Court relied on Sniadach v. Family Finance Corp. in applying a pretermination hearing rule to government-furnished benefits. Goldberg v. Kelly, 397 U.S. 254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). By June of 1971 Kacher was in default on the note and on June 21, the bank filed in the Allegheny County Court of Common Pleas a praecipe for writ of replevin. The sheriff, pursuant to the then-applicable Pennsylvania statutes and rules, seized the property the same day. On June 29, 1971 Kacher filed an action in the district court seeking injunctive relief against the ex parte replevin proceedings. He relied on Sniadach v. Family Finance Corp., supra, and Goldberg v. Kelly, supra. The district court, in denying the injunction, relied on Epps v. Cortese, 326 F.Supp. 127 (E.D.Pa.1971) (three judge court), which purported to distinguish Sniadach and Goldberg, and which upheld the validity of the Pennsylvania ex parte replevin procedures. Kacher appealed to this court from the denial of injunctive relief, but did not obtain an injunction pending appeal. On June 12, 1972, the Supreme Court reversed Epps v. Cortese, supra. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). On August 29, 1972 a panel of this court remanded this case for a "determination of damages."
 
 
 36
 Meanwhile, in the face of a pending application for injunctive relief challenging the bank's foreclosure method on due process grounds, in the face of Sniadach and Goldberg, in the face of an appeal to this court, and in the face of an appeal from Epps v. Cortese, supra to the Supreme Court, the bank chose to proceed with a sale of the seized chattels, when other foreclosure methods which would have complied with due process could have been resorted to. The majority reaches the amazing conclusion that although Kacher was absolutely right in asserting, in a lawsuit commenced prior to the foreclosure sale, that the method of foreclosure violated due process, he nevertheless loses because Fuentes v. Shevin will not be applied "retroactively." I dissent.
 
 I. RETROACTIVITY
 
 37
 The considerations which favor the protection of property interests which parties create in reliance upon a prior line of authorities obviously differ from the considerations involved in assessing the due process of a foreclosure method. The reliance interest is strongest at the commencement of a business or property transaction. Here, the initiation of the transaction is not involved at all; Kacher's challenge recognizes that his property interest in the seized chattels was at all times limited by the security interest for which he and the bank bargained. All that is involved in this case is the "dueness" of the process by which the Commonwealth of Pennsylvania accomplished for the bank the foreclosure of Kacher's property interest. The choice is not between the presence or absence of the bank's property interest but only between alternative methods of realization upon an acknowledged property interest, one of which does not comport with procedural due process as defined by the Supreme Court.
 
 
 38
 I am willing to read the majority opinion for the least, rather than the worst that is intended, even though I think that its unarticulated major premise is hostility to the Sniadach, Goldberg, Fuentes line of authorities. Despite its sweeping nonretroactivity language, the majority's only holding is that Fuentes v. Shevin will not apply to any foreclosure by prejudgment ex parte replevin which was commenced prior to July 12, 1972, even though the foreclosure sale took place in the face of a Fuentes v. Shevin type objection, so long as the sale did not take place after July 12, 1972. But even so restricted a holding cannot be sustained on the basis of extant nonretroactivity jurisprudence in the Supreme Court.
 
 
 39
 In Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) the Court attempted a synthesis of its retroactivity jurisprudence as applicable to civil cases. Justice Stewart identified three significant factors.[1] The first may best be described as the reliance factor. A party against whom a rule announced by the Court is sought to be applied may be entitled to protection of its reliance interest if the rule in question (1) overruled a clear past precedent or (2) decided an issue of first impression whose resolution was not clearly foreshadowed. In this case the reliance factor cannot support the majority's judgment. Fuentes v. Shevin, supra did not overrule any clear precedent in the Supreme Court. Neither the opinion of the Court nor the dissenting opinion referred to any prior Supreme Court opinion upholding the validity of prejudgment replevin. The Court had never specifically sustained such a procedure. Indeed Justice Stewart, referring to the notice and hearing requirements, wrote:
 
 
 40
 "This is no new principle of constitutional law. The right to a prior hearing has long been recognized by this Court under the Fourteenth and Fifth Amendment." 407 U.S. at 82, 92 S.Ct. at 1995.
 
 
 41
 At best the precise, narrow issue in Fuentes v. Shevin, supra, was one of first impression. But if any new principle of law was involved, it had been announced at least as early as June 9, 1969, when the Court decided Sniadach v. Family Finance Corp., supra, reiterated as late as March 23, 1970 when the Court decided Goldberg v. Kelly, supra, and clearly foreshadowed on April 24, 1950 when the Court decided Mullane v. Central Hanover Trust Co., supra. Finding no Supreme Court authority which would justify the bank's sale in reliance on an unconstitutional foreclosure method, the majority points to Epps v. Cortese, supra, which in turn pointed to no Supreme Court decision sustaining prejudgment replevin, but purported to distinguish Sniadach and Goldberg. But Epps v. Cortese proved to be a considerably less reliable precedent in attempting such a distinction than was LaPrease v. Raymours Furniture Company, 315 F.Supp. 716 (N.D.N.Y.1970), which Epps v. Cortese acknowledged, but declined to follow.[2] See also Santiago v. McElroy, 319 F.Supp. 284 (E.D.Pa.1970); Klim v. Jones, 315 F.Supp. 109 (N.D.Cal.1970); Blair v. Pitchess, 5 Cal.3d 258, 96 Cal.Rptr. 42, 486 P.2d 1242 (1970). The most that can be said with respect to prejudgment summary remedies in the period between Sniadach and Fuentes is that their status was decidedly doubtful, with lower court opinions in disarray.[3]
 
 
 42
 Certainly Justice Stewart, in identifying the reliance factor in Chevron Oil could not have meant that a party could rely on isolated district court cases refusing to apply a general legal proposition announced in prior Supreme Court cases, especially when the alternative of resorting to a method of foreclosure which complied with the general legal proposition was readily available at the time the issue was raised. No principled application of the reliance factor justifies the majority result. Here it is Kacher's justified reliance upon Sniadach and Goldberg which should control.
 
 
 43
 If I understand what the Court intended in Chevron Oil, the first inquiry goes to the reliance factor. Absent that factor, law announced by the Supreme Court should be applied by the lower federal and the state courts at least in all cases where the judgment has not become final.[4] But the majority, without analysis of the policies which would justify the bank's reliance on a dubious foreclosure method, holds that reliance was proper. Even assuming that to be the case, the issue is not concluded and we must pass to the second Chevron Oil factor.[5] That factor is the purpose of the rule in question, and whether retrospective application will further or retard its operation. It is ignored in the majority opinion. The purpose of the Mullane, Schroeder, Sniadach, Goldberg, Fuentes notice and hearing rule is never even mentioned. The purpose of the rule is to define the fundamental constitutional guarantee of due process of law, by establishing notice and a hearing as the bare minimum of due process in civil actions involving termination, under sanction of law, of significant property interests, whether by escheat, garnishment, replevin or otherwise. Granting full retroactive effect to procedural due process rules in pending cases will, it seems to me, best encourage vigilance for and solicitude of such due process rights in close cases. Moreover, these rights will be most vigorously asserted by those entitled to them when such persons perceive that they will not be denied the fruits of their litigation by a prospectivity limitation. The majority disregards these significant factors.
 
 
 44
 The third factor mentioned in Chevron Oil is the inequity imposed by retroactive application. In discussing that factor the majority chooses to emphasize that what is now before us is an application for money damages. But it is an application for money damages incidental to equitable relief.[6] As a previous panel of this court has already held, the injunction was erroneously denied.[7] The issue, in weighing equities, is which party should, in the circumstances of the case at bar, bear the cost of the district court's original erroneous denial of injunctive relief. Since the bank proceeded in the face of a timely complaint against its due process violation, in the absence of a governing Supreme Court precedent, in the face of Sniadach and Goldberg, in the face of an appeal in this case and in the district court case on which it relied, with lower court authorities in disagreement on the legality of the process upon which it relied, and with the clear alternative of resorting to other methods of foreclosure of its lien which would have afforded notice and hearing, I can find no equity which should put the risk of damage on Kacher rather than the bank. If the majority is doing "equity" it is an "equity" to which I am a stranger.
 
 
 45
 The majority opinion refers to "ample precedent for a refusal to invalidate replevin proceedings begun before the date of the decision." Douglas-Guardian Warehouse Corporation v. Posey, 486 F.2d 739 (10th Cir. 1973) presents an entirely different issue than that presented here. It involved a collateral attack upon three state court replevin judgments which had become final, and under which third party rights had vested. In rejecting that claim Justice Clark relied upon the finality rule of cases such as Chicot County Drainage District v. Baxter State Bank, supra, and Kalb v. Feuerstein, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940). In this case the application for injunctive relief took place before the replevin sale, and thus before any third party interests attached. Moreover, Kacher is not now seeking to set aside that sale. He seeks only monetary relief for damages caused by permitting it.
 
 
 46
 Turning to the New England cases, it is noteworthy that several of these, too, involved collateral attacks and third party interests. McIntyre v. Associates Financial Services of Mass., Inc., 328 N.E.2d 492 (Mass.1975), for example, was a suit to set aside an attachment by a purchaser from the original debtor who purchased two months after the attachment and with notice thereof. In Bay State Harness Horse R & B Ass'n. v. PPG Industries, Inc., 365 F.Supp. 1299 (D.Mass.1973) (three judge court), a suit, as here, for injunctive relief, the court granted relief not only to the parties in the case but to all parties who submitted amicus briefs and to all cases pending in the district court. Under Bay State Harness, Kacher would recover. The court's discussion of prospectivity dealt frontally with, and solved, the problem of the unsettling effect collateral attacks would have on the law of property.[8] That consideration is not involved in this case. In all of the New England cases relied upon by the majority, with the sole exception of the per curiam in Ruotolo v. Gould, 489 F.2d 1324 (1st Cir. 1974), the plaintiffs seeking injunctive relief in the federal court prevailed. Even recognizing that a massive dislocation in the usual course of creditor remedies in New England[9] was required by Fuentes v. Shevin, if Ruotolo v. Gould does not involve third party rights (as to which it is ambiguous) its reasoning is unpersuasive.
 
 
 47
 The district court's nonretroactivity holding and the majority's acceptance of it are therefore unacceptable to me. Whether viewed from the perspective of federal retroactivity jurisprudence, equity, or sound policy, the facts of this case do not justify a holding of nonretroactivity.
 
 II. § 1983
 
 48
 In discussing the question of damage liability the majority takes pains to demonstrate that as an alternative ground to its nonretroactivity holding, appellant's damage recovery is barred by appellee's qualified immunity. I disagree with the majority's approach for the following reasons.
 
 
 49
 First, it is plain that the order appealed from was based solely on the issue of the nonretroactivity of Fuentes and not on any issue of § 1983 immunity. The majority has therefore decided an issue not properly before it, much as the Court of Appeals for the Eighth Circuit had done in Wulff v. Singleton, 508 F.2d 1211 (8th Cir. 1975), rev'd 106 U.S. 428, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). In Wulff, a suit for declaratory and injunctive relief challenging the constitutionality of a Missouri abortion statute, the complaint was dismissed for lack of standing. The Eighth Circuit not only reversed on the standing point but proceeded to declare the statute unconstitutional. In reversing, the Supreme Court held that
 
 
 50
 (o)n this record, we do not agree, however, with the action of the Court of Appeals in proceeding beyond the issue of standing to a resolution of the merits of the case. . . . (T)he Court of Appeals' resolution of the merits seems to us to be an unacceptable exercise of its appellate jurisdiction.
 
 
 51
 . . . The District Court granted his motion to dismiss and no more. . . . and on appeal petitioner limited himself entirely to the standing determination that underlay it. In short, petitioner has never been heard in any way on the merits of the case.
 
 
 52
 It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below. Id. at 119, 96 S.Ct. at 2876.
 
 
 53
 In short, I think this Court has no business reaching out and ruling on a question of immunity from civil rights actions, a ruling that may have broad repercussions, in a case that does not call for consideration of the issue. I conclude that the majority's approach can only be explained by the fact that the majority views civil rights and civil rights actions "with antagonistic eyes," in Justice Douglas's phrase. Warth v. Seldin, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (Douglas, J., dissenting). Section 1983 is still a law of the United States, and the majority's effort in reaching out to narrow its scope in a case that does not call for the issue to be reached manifests, to me at least, "an indefensible hostility to the claim on the merits." Id. at 520, 95 S.Ct. at 2216 (Brennan, J., dissenting).
 
 
 54
 It is important to lay bare exactly what the majority has done in its qualified immunity holding. Immunities from liability for particular classes of defendants are creatures of policy. A newspaper's qualified immunity from defamation liability, for example, is premised on balancing plaintiff's privacy and reputation interests with first amendment considerations and the public's right to be informed concerning current events and public figures. Immunity for governmental officials exercising their official functions is premised on the desirability of having public servants fearlessly perform their duties and on a policy of not discouraging competent persons from entering public service for fear of exposure to liability. There is no comparable justification for extending immunity under § 1983 to people generally. Section 1983 prescribes liability against "(e)very person." A bank is not in the same position as a public official, who may be duty-bound to take certain actions in performance of his or her job. No such rationale for immunity clothes the action of the bank, which could very well have pursued alternative methods of collecting Kacher's debt.
 
 
 55
 Moreover, as this Court held in Skehan v. Bd. of Trustees of Bloomsburg St. College, 538 F.2d 53, 60 (3d Cir. 1976), the presence or absence of an immunity is a question to be determined on the basis of evidence adduced at trial. Judge McCune's Order of July 26, 1974 focused on two issues, whether the bank was a person for § 1983 purposes, and whether Fuentes was retroactive. Plaintiff was never asked to address the issue of malice or good faith. I do not think that judgment on the pleadings is an appropriate exercise of the appellate function. This is particularly true when, as this Court has previously held, qualified immunity is a defense which defendant must prove by a preponderance of the evidence. Skehan, supra at 61. See also O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). The majority would require plaintiff to allege the nonexistence of immunity as an element of his cause of action. With all due respect, the majority has got it backwards. It is quite anomalous to require government officials, whose immunity is supported by sound policy, to prove it as a defense while allowing other persons, who have no immunity justifiable in policy, to enjoy it without a scintilla of proof.
 
 
 56
 As a final point, I find no merit in the majority's analogy with malicious prosecution or abuse of process theories. I must emphasize that the gravamen of Kacher's complaint was that he was denied due process of law by the replevin procedure used by the bank. The complaint is based on the exact opposite of abuse of process: it is based on an absence and a denial of process. I respectfully dissent.
 
 
 
 [1]
 When the plaintiff appealed to this court at our No. 71-1882,
 the only issue before the appellate court was whether (the district court) had abused (its) discretion in refusing to grant relief.
 The Circuit Court could not have decided the merits of the case and (hold) that the defendant was liable in damages because that issue was not presented, and could not have been presented, on appeal.
 On remand, then, the issue before the Court was and still is whether the plaintiff is entitled to injunctive relief. In its present posture there is no issue of damages. 2 The issue is simply whether we should issue an injunction.
 
 
 [2]
 The Court of Appeals routinely signed the plaintiff's motion and remanded the case with instructions to determine damages. Since the original motion filed here requested no damages we assume that part of the Circuit's order was inadvertently picked up from the language of the plaintiff's motion on appeal, or else it was mere surplusage and, therefore, we will not give it effect
 See Memorandum and Order of District Judge McCune, July 26, 1974, pp. 4-5.
 1A This court's refusal to issue a writ of mandamus to halt this procedure indicated that the district court, within the scope of our remand order, had authority to require Kacher to plead and prove damages against the Bank. Thus, the dissent notwithstanding, our affirmance of the district court's later determination that Kacher was not entitled to damages is consistent with both our remand order and our refusal to issue a writ of mandamus on Kacher's motion.
 
 
 [2]
 We here refer to the date of the Fuentes decision, June 12, 1972, and not, as the dissent supposes, to the date of the Sniadach decision, June 9, 1969. We measure from the commencement of procedures to collect the debt, not from the date the debt was incurred
 
 
 [1]
 He wrote:
 "In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, see, e. g., Hanover Shoe v. United Shoe Machinery Corp., supra, 392 U.S. 481, at 496, 88 S.Ct. 2224, 20 L.Ed.2d 1231, or by deciding an issue of first impression whose resolution was not clearly foreshadowed, see, e. g., Allen v. State Board of Elections, supra, 393 U.S. (544) at 572 89 S.Ct. (817) at 835, 22 L.Ed.2d 1. Second, it has been stressed that 'we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' Linkletter v. Walker, supra, 381 U.S. 618, at 629, 85 S.Ct. (1731) at 1738, 14 L.Ed.2d 601. Finally, we have weighed the inequity imposed by retroactive application, for '(w)here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity.' " Cipriano v. City of Houma, supra, 395 U.S. (701) at 706, 89 S.Ct. (1897) at 1900, 23 L.Ed.2d 647.
 404 U.S. at 106-07, 92 S.Ct. at 355. (emphasis added).
 
 
 [2]
 The Epps v. Cortese Court wrote ". . . we do not hesitate to state that we are in disagreement with LaPrease mainly due to what we consider to be misplaced reliance on the Sniadach and Goldberg cases." 326 F.Supp. at 136
 
 
 [3]
 The cases are collected in Fuentes v. Shevin, supra, 407 U.S. 67, at 72 n. 5, 92 S.Ct. 1983, 32 L.Ed.2d 556
 
 
 [4]
 The modern law of nonretroactivity emerged as a consequence of the possibility of collateral attack on final judgments, starting with Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). It outgrew its collateral attack origins implicitly in Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) and explicitly in Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971). But especially in civil cases interest in the repose of judgments has always been a significant additional factor weighing against retroactivity. E. g., Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940). That interest is not involved in this case, for we are not presented here with a collateral attack upon a judgment. As Justice Harlan wrote in Mackey v. United States, 401 U.S. 667, 675, 701, 91 S.Ct. 1160, 1171, 1184, 28 L.Ed.2d 404 (1971) (concurring and dissenting opinion): "Treating direct and collateral review as if they were of one piece seems to me faulty analysis, ignoring, as it does, the jurisprudential considerations that differentiate the two kinds of adjudicatory functions. As a court of law we have no right on direct review to treat one case differently from another with respect to constitutional provisions applicable to both." See also A. Bickel, The Supreme Court and the Idea of Progress 54-57 (1970)
 
 
 [5]
 See, e. g., Jiminez v. Weinberger, 523 F.2d 689, 703 (7th Cir. 1975) (Stevens, J.), cert, denied, 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1204 (1976)
 
 
 [6]
 The majority chooses to regard the issue of money damages as a new element in the case, and one which was not before any prior panel of this court. Yet Kacher's prayer for relief, in his original complaint sought
 that an Order be made herein staying all Writs of Replevin within the jurisdiction of this Court or in the alternative to stay the Writs of Replevin at 2966 and 2967 July Term, 1971 and directing that the Sheriff or any other persons who has possession of your Petitioner's property to release and to deliver to your Petitioner the said property and to vacate the Order of the Court of Common Pleas of Allegheny County ordering your Petitioner to make said automobile available to the Sheriff of Allegheny County for execution of the Writ of Replevin at 2967 July Term, 1971 and for such other, further and different relief as this Court might seem just and proper. (Emphasis added).
 Thus, money damages were indeed prayed for as incidental to equitable relief. We are past the point where it can still be contended that an equity court lacks the power to award damages. See, e. g., United States Steel Corp. v. United Mine Workers of America, 456 F.2d 483, 490-92 (3d Cir.), cert. denied, 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334 (1972).
 
 
 [7]
 On August 29, 1972, a panel of this court entered an order of summary reversal and remanded this case for a determination of damages. The majority chooses to regard this order as mere inadvertence. I cannot agree that judgments of this court are to be so lightly treated. Obviously, a remand for determination of damages is not a ruling on the merits of the damage claim. Equally obvious is the fact that a summary reversal in light of the Fuentes decision meant that, based on Fuentes, the prior denial of injunctive relief was error. The ruling necessarily meant that Fuentes applied to the instant case. If not, this court would have affirmed. Since the foreclosure sale had already occurred at this point, and since the prior panel did not dismiss the appeal as moot, but remanded instead for a trial on damages, there can be but one interpretation; that further proceedings were called for to determine damages, and that the retroactivity of Fuentes was law of the case. Our subsequent denial of mandamus to the district court turned on a remedies issue and has no bearing on this interpretation
 
 
 [8]
 Judge Murray, writing for the Court in Bay State Harness, wrote:
 ". . . we limit the effect of the judgment ordered today (1) to the parties in the cases at bar, including parties in cases not heard orally but who have participated as amici curiae in the proceedings before the court, and (2) to the enforcement of chapter 223, sections 42, 62-66 which are similarly constitutionally challenged in cases now pending before the district judges in this District, and (3) to the prospective enforcement of chapter 223, sections 42, 62-66 insofar as these sections deny parties notice and opportunity to be heard prior to the making of attachments of their real estate, from the time of the filing of the order entered herewith. This course is taken to avoid uncertainty and doubt that a retrospective judgment would cast upon the validity of all attachments of real estate made in civil actions now pending in the Massachusetts courts." 365 F.Supp. at 1307 (footnote 6 omitted; emphasis added).
 Judge Murray continued, at Id. n. 7:
 "We note that another case in this District, Higley Hill, Inc. v. Knight, 360 F.Supp. 203 (D.C.Mass. 1973), declined to apply Fuentes retroactively to attachments made before June 12, 1972, the date Fuentes was decided. We declined to take such a narrow approach for the reasons set forth in Gunter v. Merchants Warren National Bank et al., supra at n. 17. Compare Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) with Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)."
 
 
 [9]
 In some New England states, ex parte attachment and nonjudicial foreclosure have for centuries been the norm in enforcing creditors' rights. See, e. g., Schneider v. Margossian, 349 F.Supp. 741, 743 (D.Mass.1972):
 "Under long-standing practice, most civil actions in Massachusetts may be commenced by attaching the defendant's property. Under this procedure, the plaintiff simply fills in the blanks on a writ, averring that the defendant is liable to him for a certain amount on a particular cause of action; the writ then directs the appropriate officer to attach the property of the defendant . . . ."
 Similar provisions formerly existed in Maine Law, Gunter v. Merchants Warren Nat'l Bank, 360 F.Supp. 1085 (D.Me.1973) (discussing 14 M.R.S.A. § 4451 et seq.), and in the law of New Hampshire, Hampton Nat'l Bank v. Desjardins, 114 N.H. 68, 314 A.2d 654 (N.H. Supreme Court 1974) (discussing similar provision at N.H.R.S.A. §§ 511-A:1 et seq., 512:9-b).