Richard L. INGLE, Respondent,

v.

ILLINOIS CENTRAL GULF RAILROAD COMPANY, Appellant.

No. 40300.

Missouri Court of Appeals,
Eastern District,
Division Two.

Jan. 22, 1980.

On Rehearing En Banc July 1, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 18, 1980.

Application to Transfer Denied
Sept. 9, 1980.

Greenfield, Davidson, Mandelstamm & Voorhees, Alphonso H. Voorhees, St. Louis, for appellant.

Friedman, Weitzman & Friedman, C. Marshall Friedman, St. Louis, for respondent.

PUDLOWSKI, Judge.

Respondent brought suit under the Federal Employers' Liability Act for lost wages and debilitating injuries suffered on the job against his employer, the Illinois Central Gulf, (appellant). The jury returned a verdict in respondent's favor of $550,000. The railroad appeals.

Respondent went to work for the Gulf, Mobile and Ohio (which later became part of the Illinois Central Gulf System) in the railroad yards at Montgomery, Alabama, in 1950. He started as a helper and rose to the level of carman, a member of a skilled craft which repairs the couples, trucks,

wheels, doors and safety appliances on railway boxcars, hoppers and gondolas.

In 1959, the railroad's diesel repair shop at Montgomery moved to Tuscaloosa. Prior to 1959, specially trained machinists and electricians inspected the locomotives daily at Montgomery and did all necessary repair work there. When the diesel repair shop moved to Tuscaloosa, so did the machinists and electricians.

Because federal regulations required that locomotives be inspected daily, it was necessary for the appellant to inspect the locomotives being used in the Montgomery yards. However, because there were no machinists and electricians at Montgomery, the railroad pressed carmen into service to perform the inspections.

Respondent was one such carman. On Friday, November 16, 1973, a traction motor blower broke on Engine 1269. Respondent's foreman instructed him to fix it when a new blower arrived. It came from Tuscaloosa on Tuesday, November 20.

The traction motor blower lies in the high voltage cabinet of the engine about two and one-half to three feet below the engine. The high voltage cabinet is a clutter of wires, pipes, fuel pumps, valves, and has a shaft going through it which powers the traction motor blower. There is barely enough room for a man to squeeze into the cabinet. The floor of the cabinet is sometimes slippery due to the presence of an oily film.

Testimony from former machinists stated that the correct method of removing a blower requires the use of two chain block hoists and three men, a machinist, a helper and a laborer. However, respondent had never seen this method used and had no knowledge of it. The railroad had never given respondent any training on how to remove a blower; it had neither provided him with tools nor given him adequate help to do the job.

Prior to his injury, respondent had removed five or six blowers alone by lifting them up and out of the cabinet without the aid of a hoist or additional manpower. On November 20, 1973, as respondent was in a twisted and contorted position inside the cabinet, lifting the blower up and out, the blower, being top–heavy and weighing about 100 pounds, flipped over wrenching his arms. His right arm felt like it had been ripped from its socket; the pain shot between his shoulders, down his back and into his right arm. However, because the compartment was so cramped, he did not drop the blower lest he drop it on himself.

Respondent finished work that day and continued to report to work hoping his condition would improve and his pain would subside. However, his condition deteriorated and his pain got worse and worse. In February of 1974, respondent was hospitalized for a myelogram. The myelogram revealed damage to both the cervical and lumbar areas of his spine. Later in February of that year this 45 year old respondent was rehospitalized and underwent cervical disc surgery. In June he underwent lumbar disc surgery. Since his operations, respondent's right arm has so atrophied that he possesses only about ⅖ to ⅗ of the strength of his left arm. He can do no work requiring the use of his right arm. Certain activities cause his legs to bother him. He can drive a car providing it is equipped with power brakes and power steering. His pain is constant. He sleeps little. He takes Percodan, a narcotic, and wears a transcutaneous nerve stimulator. His medication and stimulator give him some relief. His condition is permanent and deteriorating.

■ The appellant's first assignment of error is that the trial court abused its discretion in overruling the railroad's motion to dismiss on the ground of forum non conveniens and the trial in St. Louis resulted in substantial prejudice to appellant.

In determining this point we must review certain standards applicable to the trial court's action. "Judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful considera-

tion; if reasonable men can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Anderson v. Robertson*, Mo.App., 402 S.W.2d 589 [3–4]." *Shirrell v. Missouri Edison Co.*, 535 S.W.2d 446, 448 (Mo. banc 1976), quoting *James v. Turilli*, 473 S.W.2d 757, 763 (Mo.App.1971).

Further, our courts have said that the doctrine of forum non conveniens is to be applied only with caution; and unless the balance of equities is strongly in favor of not forcing these defendants to trial in Missouri, plaintiff's choice of Missouri as the forum for this litigation should not be disturbed. *State ex rel. Farmland Indus., Inc. v. Elliott*, 560 S.W.2d 60, 63 (Mo.App.1977) citing *Loftus v. Lee*, 308 S.W.2d 654 (Mo. 1958); *Gulf Oil Corporation v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *J. F. Pritchard & Co. v. Dow Chemical of Canada, Ltd.*, 462 F.2d 998, 1000 (8th Cir. 1972).

The facts gleaned from the three volumes of transcript disclosed that appellant is a Delaware Corporation with its principal office in Chicago. It is actively engaged in the railroad business in the City of St. Louis and the State of Missouri. It maintains offices and employees throughout the Metropolitan St. Louis area. Additionally, the appellant's trial attorney has a St. Louis office. Moreover, the trial of the case did not present the difficulties predicted by his client in its motion. It appears that respondent and appellant produced those witnesses deemed important without difficulty. The respondent produced at trial the two examining doctors and all of the medical records from the Montgomery, Alabama hospital. Further, the appellant's trial attorney and claims manager were present when the two treating physicians were deposed in Montgomery, Alabama. We also note that the appellant did not obtain a medical examination of respondent by a doctor of its own choosing and presented no medical evidence.

Considering the factors as enumerated by our Supreme Court in *State ex rel. Chicago R.I. & P.R. v. Riederer*, 454 S.W.2d 36, 39 (Mo. banc 1970) [1] and the facts enumerated above this court cannot find an imbalance of equities or that the trial court's action was arbitrary or unreasonable and therefore we find that the trial court did not abuse its discretion in denying appellant's motion to dismiss for forum non conveniens. Appellant's first assignment of error is denied.

Appellant's second contention is that the trial court erred in excluding a witness for the appellant, Mr. Wilkinson, from the courtroom. The appellant contends that the exclusion was prejudicial toward the appellant and its employees. Mr. Wilkinson had previously testified for the appellant. Respondent called Mr. Stabler, an employee of the appellant, to the stand to rebut Mr. Wilkinson. Before Mr. Stabler testified, respondent's counsel requested that Mr. Wilkinson be excluded from the courtroom as Wilkinson was Stabler's foreman and would have a tendency to inhibit Stabler's testimony. The court granted counsel's request.

Appellant argues that it was prejudiced in two ways. First, the loud general announcement from the bench in the presence of the jury to exclude Wilkinson aroused suspicion of Wilkinson in the minds of the jury. Second, Wilkinson, who was the most knowledgeable technical representative of the appellant, had assisted defense counsel throughout the trial. By excluding Wilkinson, defense counsel was impaired in conducting his defense. To bolster its argument the appellant argues the purpose of sequestering a witness is to prevent a prospective witness from being taught from a previous witness's testimony.

It is well settled that under Rules 78.07 and 78.09 to preserve an issue for appellate review of any ruling of the trial court, the objecting party must make *definite* objections either at the trial or in the motion for a new trial. *Beyer v. Pick*, 428 S.W.2d 1, 3 (Mo.App.1968). The appellant at the time of the exclusion of Wilkinson objected by stating, "I certainly object," and "I will object to excluding Mr. Wilkinson." In addition the appellant in its post–trial motions stated that, "the court erred in sustaining

the request of plaintiff's attorney that the witness James Wilkinson, after he had testified be excluded from the courtroom during the testimony of plaintiff's rebuttal witness, and the court erred in overruling defendant's objection to such exclusion even though the court was assured by defendant's counsel that the witness was not going to be called again to testify. The court further erred by announcing in the presence of the jury the witness Wilkinson's exclusion from the courtroom." These objections are neither definite nor sufficient.

Appellant's contentions of prejudice are raised initially in appellant's brief and are untimely. An appellant is not permitted to broaden or change the basis and scope of an objection on appeal beyond that made in trial court. *Plumlee v. Ramsay Dry Goods Co.*, 451 S.W.2d 603, 605[2–4] (Mo.App. 1970); *State ex rel. State Highway Comm'n v. DeLisle*, 425 S.W.2d 938, 940–41 [4] (Mo. 1968); *Luechtefeld v. Marglous*, 151 S.W.2d 710, 713 [1–2] (Mo.App.1941); *Stahlheber v. American Cyanamid Co.*, 451 S.W.2d 48, 61 [7] (Mo.1970); *Langdon v. Koch*, 435 S.W.2d 730, 732[2] (Mo.App.1968).

Additionally, the record is devoid of any indicia that the trial judge's announcement was loud or boisterous and the appellant has failed to show wherein and how it was prejudiced. Therefore nothing is preserved for review.

■ Appellant's third point is that he was prejudiced by the remarks of the trial judge. At the conclusion of all the evidence the court stated:

Ladies and gentlemen of the jury, that concludes all of the testimony in this case. The only thing left now is the preparation of instructions, closing arguments of the attorney, and submitting the case to you. It's too late to submit a case of this magnitude, so I will have to excuse you for tonight and bring you back tomorrow morning.

Counsel objected to the phrase "a case of this magnitude" and asked for a mistrial.

The granting of a new trial rests largely in the discretion of the trial court. *Rovak*

*v. Schwartz*, 339 S.W.2d 756 (Mo.1960). Although the court's comment was untimely, the court corrected its error by explaining to the jury that by "magnitude of the case" he "genuinely" meant that the case had taken four days to try and further that he viewed all cases as important. After that explanation and additional discussion with appellant's counsel at bench he again addressed the jury, "As a result, that was the manner in which that statement was made. All of the jurors understand this? Okay. Let the record indicate that all of the jurors are nodding their heads, all of the jurors understand this? (The jurors nodded in the affirmative.)" Appellant's third point is without merit.

Appellant's fourth point is that the trial court erred by failing to instruct the jury on whether the award would be taxed to the plaintiff. After the jury had retired, a juror approached the judge and asked if he could ask a question. The judge told him not to say anything, but to write his question out. The juror wrote, "What taxes come out of any settlement?" The judge then informed counsel for both parties that he was going to respond in writing, "You have been fully instructed," which the court did.

■ Our Supreme Court has held that the M.A.I. Instructions submit ultimate issues and they do so aptly. Therefore they do not require further clarification or amplification. *Houston v. Northup*, 460 S.W.2d 572 (Mo. banc 1970); *Senter v. Ferguson*, 486 S.W.2d 644 (Mo.App.1972). Since F.E.L.A. cases are covered by M.A.I. 24.01 which does not provide for an instruction on taxation, the giving of such an instruction would be an amplification of an already adequate instruction. It would have been error for the court to have given the requested instruction. Appellant's fourth point is not reversible error and without merit.

■ Appellant's final point is that the trial court erred in giving instruction No. 2, which is M.A.I. 24.01, by failing to give an additional paragraph requiring the finding that "defendant knew or by using ordinary

care should have known of such condition, and that such condition was reasonably likely to cause substantial harm."

Instruction No. 2 as submitted by respondent and given by the trial court was:

"Your verdict must be for the plaintiff if you believe:

"First, defendant failed to provide reasonably safe methods of work, and

"Second, defendant was thereby negligent, and

"Third, such negligence directly resulted in whole or in part in injury to plaintiff."

Note No. 3 of the "Notes on Use" in reference to the M.A.I. 24.01 instruction, as applicable at the time of the trial, states:

These theories of negligence concern conditions of which the defendant had constructive knowledge.

In the event plaintiff submits some act of negligence, constructive knowledge of which is not chargeable to the railroad, there shall be submitted in addition a paragraph providing "defendant knew or by using ordinary care should have known of such condition, and that such condition was reasonably likely to cause substantial harm." This paragraph should be inserted between existing paragraphs, Third and Fourth, and the paragraphs should be renumbered accordingly.

The appellant contends that there was not sufficient evidence to establish the defendant's constructive knowledge and therefore the suggested paragraph of Note No. 3 of the "Notes on Use" should have been given.

Our Supreme Court has held that when plaintiff submits that defendant failed to provide either (a) reasonably safe conditions for work, or (b) reasonably safe appliances, or (c) reasonably safe methods of work, or (d) reasonably adequate help, it is unnecessary to charge "defendant knew or by using ordinary care should have known of such condition...." *Wilmoth v. Chicago, R.I. & P.R.*, 486 S.W.2d 631, 639 (Mo.1972).

Plaintiff was a carman and was performing machinist's work, for which he was totally unqualified by training, instruction or experience. Carmen are those employees that build, repair and maintain various freight cars and box cars. The carman craft and the other shop crafts, including the machinists, are required to complete a four year apprenticeship and receive extensive specialized training and instruction in their mechanical fields. The work of repairing and maintaining diesel engines and locomotives, including the removal of traction motor blowers, is the work of the machinist craft. Carmen are not trained in that work, that is not their job. After the last machinist retired or was furloughed at Montgomery, in approximately 1959, the railroad did not rehire any machinists. The equipment and tools used by the machinists were either scrapped or packed up and shipped to other points on the railroad. Carmen were thereafter required to perform the machinists' work of maintaining and repairing locomotives. The carmen received no instructions from machinists or anyone else in performing that work, and were required to provide their own tools and equipment. The task of removing a traction motor blower was extremely difficult, awkward and strenuous. Several carmen, in addition to plaintiff, who testified at the trial agreed that they were required to perform that task alone, without assistance and without the aid of any mechanical lifting device or hoist, even though the job was too strenuous and difficult to be performed by one man.

Plaintiff was assigned the diesel locomotive job in 1970 or 1971. He was the only employee assigned to work that position. He was not qualified and had never received any training or instruction of any kind. He requested schooling and training. However, none were provided. He requested instructional books. However, none were provided. He was neither provided equipment nor tools and therefore purchased his own. He was provided nothing to perform that job. Before the date of this occurrence he had previously removed two traction motor blowers. The blowers were inaccessible, down in a hole in the high voltage cabinet. His foreman, Mr. Dewber-

ry, instructed him to get in, unloosen the bolts and get it out. No equipment or assistance were provided. He had extreme difficulty both times. He spoke to Mr. Dewberry and told him, "There must be a better way or easier way to do this. It's got to be." Mr. Dewberry told him to do the best he could. Plaintiff requested training or lessons in removing traction motor blowers. However, none were provided. He requested equipment and help. However, none were provided. Neither plaintiff nor any of the other carmen knew of the method used by the machinists, involving two or three employees and two chain block hoists, which was fully described at the trial.

The above evidence was totally undisputed at the trial. That evidence unequivocally established that the defendant had actual knowledge of the proper safe method which should have been utilized to remove a traction motor blower.

We hold that appellant's claim that the submitted instruction was not supported by the evidence has no merit. Accordingly, judgment is affirmed.

GUNN, P. J., and STEPHAN, J., concur.

## ON MOTION FOR REHEARING

PER CURIAM:

This cause was argued and submitted to Division Two of this court at its October, 1979, session in St. Louis. On January 22, 1980, the principal opinion was adopted without dissent. On February 6, 1980, the appellant filed its motion for rehearing or transfer to the Supreme Court of Missouri. While appellant's motion was under consideration, the Supreme Court of the United States, on February 19, 1980, handed down its opinion in *Norfolk & W. Ry. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980). *Liepelt* was an F.E.L.A. death claim and held, among other matters, that it was necessary that the jury be instructed that no damage award shall be subject to federal income tax. On May 6, 1980, appellant's motion for rehearing was heard en

banc on the *Liepelt* issue regarding income tax instruction and whether its application would be prospective or retrospective.

To apply the Supreme Court's ruling in *Liepelt* to the instant case, several principles must be reviewed. We recognize, as indeed we must, that the substantive rights of the parties are governed by federal law and the decision of the U. S. Supreme Court must control, *Horn v. Atchison, T. & S. F. Ry.*, 519 S.W.2d 894, 896 (Tex.Civ.App.1975). It has long been settled that questions concerning the measure of damages in an F.E. L.A. action are federal in character. This is true even if the action is brought in state court. *Norfolk & W. Ry. v. Liepelt*, supra.

However the Court did not enunciate whether its ruling was to be applied retroactively to pending appellate cases. We must therefore apply existing standards and guidelines. In *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 350, 30 L.Ed.2d 296 (1971) the Court stated:

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, * * * or by deciding an issue of first impression whose resolution was not clearly foreshadowed * * *. Second, it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." * * * Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." * * *

Applying the above standards to the facts of the instant case, we have determined that *Liepelt* should be applied prospective-

ly.[1] First, the rule promulgated by the Supreme Court is one of first impression. The federal circuits were split on whether the jury should be instructed on income taxes. See *Domeracki v. Humble Oil & Refining Co.*, 443 F.2d 1245, 1252 (3rd Cir. 1971). The Missouri appellate courts forbade such an instruction. *Senter v. Ferguson*, 486 S.W.2d 644 (Mo.App.1972). *Liepelt* will, for the first time, unify the federal and state F.E.L.A. instructions on this point. The trial judge in the instant case was executing his duties according to the law, *Lemon v. Kurtzman*, 411 U.S. 192, 202, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973), and at that time, it was mandatory that he not give such an instruction. Therefore he was not in error in failing to anticipate future changes in instructions on this subject mandated by the highest court of the land. *Smile v. Lawson*, 506 S.W.2d 400, 402 (Mo. 1974).

Secondly, for us to apply the *Liepelt* rule retroactively to the instant case would be anomalous. A careful analysis of the "Second" factor in *Chevron*, requires us to "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation."

Since the primary purpose underlying *Liepelt* was the Court's desire to prevent the rendering of an excessive verdict founded upon improper considerations, retroactive application of *Liepelt* could in no manner be held to "further" the operation of the rule unless it is apparent in a particular case on direct appeal that the damages awarded are obviously excessive. Accordingly, in the instant case where the damages awarded are clearly reasonable, justified and supported by the evidence,[2] indiscriminate retroactive application would not "further" the purpose of the rule and conversely its prospective application would not "retard" its operation.

Such non–retroactive application is supported by the three cases cited and relied upon by the United States Supreme Court in *Liepelt*: *Dempsey v. Thompson*, 251 S.W.2d 42 (Mo.1952); *Domeracki v. Humble Oil & Refining Co.*, 443 F.2d 1245 (3rd Cir. 1971) and *Burlington Northern, Inc. v. Boxberger*, 529 F.2d 284 (9th Cir. 1975). In all three cases the new rule with respect to the income tax instruction was given prospective application only, and its prospectivity was in no manner construed to retard its purpose or operation. Since those cases were cited and relied upon in *Liepelt*, and since prospective application of the new rule in those cases did not retard its operation, "prior history" clearly supports nonretroactive application in the instant case.

In cases in which uncertainty exists as to whether retroactive application would further or retard the operation of a new rule, other courts have employed a similar balancing test in applying the "Second" factor in *Chevron*. They have weighed such factors as reliance upon existing applicable law, the need for stability, resulting hardship and injustice, against the benefits to be gained by applying a new rule retroactively.[3]

In the case at bar since the damages awarded are not excessive, it is difficult to imagine how the appellant has been prejudiced. Because the award is reasonable and amply supported by the evidence, retroactive application of *Liepelt* would serve no useful purpose. Retroactivity would not further the purpose of the new rule. Likewise, prospectivity would not retard its operation. There is therefore simply no compelling reason to give retroactive effect to

1. See generally prospective or retrospective operation of overruling decision, Annot., 10 A.L.R.3d 1371 (1966).

2. See pp. 83, 84 of this opinion.

3. See *Ramey v. Harber*, 589 F. 753 (4th Cir. 1978), cert. denied 442 U.S. 910, 99 S.Ct. 2823, 61 L.Ed.2d 275; *Kacher v. Pittsburgh National Bank*, 545 F.2d 842 (3rd Cir. 1976); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1973); *Lemon v. Kurtzman*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); *Linkletter v. Walker*, 381 U.S. 618, 629, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); and *Keltner v. Keltner*, 589 S.W.2d 235 (Mo. en banc, 1979), regarding preference for prospective application.

*Liepelt* here. The trial court and respondent scrupulously complied with existing applicable law, as they were compelled to do, and they should not be penalized under such circumstances. Since retroactive application would occasion a reversal in this instance, in which no actual prejudice has been suffered, consideration of this "Second" factor in the above light compels a ruling of prospectivity.

Finally, the third factor to be considered is whether or not retroactively applying *Liepelt* would produce substantial inequitable results to the plaintiff. In that case the amount of the pecuniary loss was $302,000, according to plaintiff's economist, and the jury awarded damages of $775,000. The defendant objected and by its expert testimony the net pecuniary loss was $138,327. The Supreme Court believed that based upon those facts, the jury must have considered the tax issue and included it in their decision and therefore the defendant was prejudiced. However in this case we do not have any proof or suggestion that the appellant was prejudiced by the failure of the trial court to submit the requested but not offered cautionary instruction. Further, the appellant did not raise the issue of excessiveness. To briefly review the pertinent facts, the plaintiff was 45 years old, earning $12,000 per year at the time of the accident. He suffered permanent, serious, deteriorating and disabling injuries, including, among other surgery, an insertion of a nerve stimulator affixed to one of his limbs. The jury had the benefit of testimony from four physicians including a neurosurgeon, a neurologist and orthopedic surgeon. The appellant saw fit not to have the plaintiff examined nor to offer any medical evidence from which the jury could evaluate the extent and degree of plaintiff's injury. It is argued that by the mere fact that the jury made inquiry about taxes, we must assume that the jury acted improperly and inflated the recovery. We do not agree. There is no evidence in the record that the jury was in fact motivated by such fact and, it must be presumed that the jurors followed their oaths and rendered their verdict according to the evidence and the court's instructions. *Cristie v. Gas Service Co.*, 347 S.W.2d 135, 144[12] (Mo.1961); *Beste v. Tadlock*, 565 S.W.2d 789, 791–92[4–6] (Mo.App.1978). Appellant's motion for rehearing and motion to transfer to the Supreme Court are denied.

All judges concur.