**FIRST NATIONAL BANK OF FORT SMITH, Conservator of the Estate of Arthur Santos Felix, Respondent–Appellant,**

v.

**The KANSAS CITY SOUTHERN RAILWAY COMPANY, Appellant–Respondent.**

Nos. WD 46969, WD 46986.

Missouri Court of Appeals, Western District.

Sept. 21, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 2, 1993.

Application to Transfer Denied Dec. 21, 1993.

Steven B. Garner, Springfield, for respondent-appellant.

Harlan D. Burkhead, Kansas City, for appellant-respondent.

Before FENNER, P.J., and SPINDEN and SMART, JJ.

SPINDEN, Judge.

Arthur Santos Felix[1] sued Kansas City Southern Railway Company (KCS) for the injuries he suffered when a KCS vehicle ran over him on KCS tracks near Joplin. A jury found that Felix suffered $4.5 million in damages but assessed him with 15 percent of the fault. KCS appeals. Felix cross-appeals, claiming that the trial court erred in directing a verdict against him on his claim for punitive damages against KCS. We reverse and remand for a new trial.

The accident happened on February 26, 1989, while Felix and his girlfriend's two children were looking for pennies. They had put the pennies on railroad tracks the previous day hoping that a train would flatten them. While Felix looked to the south, a hy-rail truck[2] driven by KCS employee Gary Helton[3] came from the north and hit Felix. Helton was not watching the tracks at the time.

The accident occurred just north of Joplin about one-fourth of a mile south of a public crossing known as the VFW crossing and about one-fourth of a mile north of the Tur-

---

1. First National Bank of Fort Smith, as conservator of Felix's estate, has no true interest in this case. We understand that Felix created the conservatorship voluntarily to be revocable by Felix at any time. KCS does not challenge the propriety of the bank's serving as nominal party plaintiff. For purposes of this opinion, we regard Felix as plaintiff.

2. A hy-rail truck is a pickup fitted with retractable rail wheels so it can operate on or off railroad tracks. When it operates on tracks, its steering wheel is locked, and the track and the wheel flanges steer it.

3. Helton had been a roadmaster for KCS since 1973 and had driven vehicles over this stretch of track almost daily for six years preceding the accident. He had never been involved in an accident prior to this occurrence.

key Creek trestle. K–Wood Trailer Park was east of the railroad tracks. Other residences were in the immediate vicinity. The hy-rail hit Felix just south of a foot path which ran east-west across the tracks parallel to power lines.

Helton was inspecting tracks and right-of-ways for defects. As he drove down the tracks into a curve at 25 to 30 miles an hour, he looked down to write an entry in the records he was making. While Helton wrote, the hy-rail traveled through the curve and went an additional 518 feet before hitting Felix. Had Helton been watching, he could have seen Felix approximately 500 feet—about 12 seconds—before hitting him.

Felix was treated for 47 days in a hospital for multiple, severe injuries. He presented evidence of lasting after-effects from the accident. His medical expenses through commencement of the trial totalled $139,842.30.

## I. PUNITIVE DAMAGES

Felix's only point on appeal is that the trial court erred in directing a verdict against him on his claim for punitive damages against KCS. He asserts that he presented substantial evidence from which a reasonable juror could have found that Helton's conduct[4] showed complete indifference to, or conscious disregard for, the safety of others. We agree.

### A. Preservation of the Punitive Damages Issue

■ KCS contends that because Felix did not object to its motion for directed verdict, he did not preserve it for our review. "It is well settled that under Rules 78.07 and 78.09 to preserve an issue for appellate review of any ruling of the trial court, the objecting party must make definite objections either at the trial or[5] in the motion for a new trial." *Ingle v. Illinois Central Gulf Railroad Company*, 608 S.W.2d 76, 79 (Mo.App.1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67

L.Ed.2d 341 (1981). Felix objected to the directed verdict in his motion for new trial. He preserved the issue for our review.

■ KCS also contends that Felix waived his right to appellate review by not asking the trial court to reconsider its decision at the close of all the evidence. We disagree. As this court's Eastern District stated, in *Koerber v. Alendo Building Company*, 846 S.W.2d 729, 730 (Mo.App.1992) (citations omitted):

No Missouri Supreme Court Rule sanctions the use of a motion for reconsideration.... [A] "motion for reconsideration [has] no legal effect as no Missouri rule provides for such a motion." ... However, in order that an appellant not be denied substantive review of an appeal, this district and other districts have treated a motion for reconsideration as a motion for new trial if timely filed.

### B. The Standard for Review

■ Granting a motion for directed verdict is a drastic action, and a trial court should do so only " 'when all the evidence and the reasonable inferences to be drawn therefrom are so strongly against the plaintiff that there is no room for reasonable minds to differ.' " *Schroeder v. Lester E. Cox Medical Center, Inc.*, 833 S.W.2d 411, 414 (Mo.App. 1992) (quoting *Wehrkamp v. Watkins Motor Lines, Inc.*, 436 S.W.2d 698, 700 (Mo.1969)) (emphasis omitted). In reviewing whether Felix made a submissible case on punitive damages, we view the evidence in the light most favorable to him and give him the benefit of all reasonable inferences to be drawn from the evidence and disregard all contrary inferences. *Bostic v. Bill Dillard Shows, Inc.*, 828 S.W.2d 922, 925 (Mo.App.1992).

■ The standard for determining whether Felix made a submissible punitive damages claim is whether a reasonable juror could have found that KCS' conduct showed complete indifference to or a conscious disre-

---

**4.** Helton's conduct is deemed to be KCS' conduct for the purpose of determining whether Felix made a submissible case on the issue of punitive damages. "Under the rule in Missouri, the master is liable for punitive damages for such wrongful acts of the servant as justify such dam-

ages." *Daniel v. Phillips Petroleum Company*, 229 Mo.App. 150, 157, 73 S.W.2d 355, 360 (1934).

**5.** We added the emphasis.

gard for the safety of others. *Sharp v. Robberson*, 495 S.W.2d 394 (Mo. banc 1973). " '[T]he person doing the act or failing to act must be conscious of his conduct, and, though having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury.' " *Id.* at 397 (quoting *Reel v. Consolidated Investment Company*, 236 S.W. 43 (Mo.1921)). The court has defined conscious disregard:

> "The actor's conduct is in reckless disregard for the safety of another if he intentionally does an act or fails to do an act which it is his duty to the others to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the others, but also involves a high degree of probability that substantial harm will result to him."

*Id.* at 398 (citations omitted).

### C. Basis for Felix's Claim for Punitive Damages

Felix contends that Helton's conduct showed complete indifference to, or a conscious disregard for, the safety of others. He points to these indicators:

Helton knowingly violated a KCS safety rule requiring that he keep a constant lookout for and be prepared to stop for people who may be on the track.

Helton knowingly violated a written KCS speed rule requiring him to drive at a speed that would allow him to stop for obstructions, but in no case more than 20 miles per hour.

Helton knowingly violated KCS' safety rules designed to warn the public of the hy-rail's approach by not turning on the truck's headlights and warning lights.

Notwithstanding the rules violations, Helton did not watch where he was going although he was moving through a residential area with heavy pedestrian traffic.

KCS responds first by arguing either that (1) Felix did not present sufficient evidence to prove the matters or (2) the trial court excluded the evidence and Felix has not preserved the issue for our review. Alternatively, KCS argues that the matters, even if proven, were not sufficient to make a submissible case.

### D. Specific Points Preserved

In reviewing Felix's claim for punitive damages, we must restrict our consideration to the theories pleaded and preserved in Felix's motion for new trial. *Plumlee v. Ramsay Dry Goods Company*, 451 S.W.2d 603, 605–06 (Mo.App.1970). Felix's motion for new trial asserted that the basis for punitive damages was Helton's violation of rules requiring a careful lookout and being prepared to stop for obstructions, his violation of speed rules, and his failure to watch where he was going although he was aware of heavy pedestrian traffic in the area.

### 1. Headlights and Warning Lights Rules

■ Felix asserts that he preserved the issue of the headlights and warning lights rule by proffering the deposition testimony of Kenneth Smith, KCS' superintendent of rules, concerning the rule. "It is settled law that where a trial judge has erroneously excluded evidence but the same is preserved in the record by proffer and thereafter a verdict is directed for the defendant, this court on appeal may consider the entire record including the evidence erroneously excluded[.]" *Look v. French*, 346 Mo. 972, 981, 144 S.W.2d 128, 132 (1940). We find no offer of proof or ruling by the trial court on the matter. Felix did not claim in his motion for new trial that the trial court erred in excluding evidence of the rule. Felix directs us to the supplemental legal file and transcript pages, but those references did not concern an offer of proof regarding Smith's testimony about the rule. A document entitled "Plaintiff's Offers From the Deposition of Kenneth G. Smith" is in the supplemental legal file. It contains page and line references to Smith's deposition. Following this document are pages from Smith's deposition stamped "TESTIMONY OFFERED, BUT REFUSED." We cannot find, however, a ruling or order of the court refusing this testimony either in the transcript or legal file; nor do

we find any objection in the record or in Felix's motion for new trial that the trial court erroneously excluded the evidence or an offer of proof by Felix. Providing us a complete record is the party's responsibility. Rule 81.12. We conclude that Felix did not preserve the issue for our review.

### 2. Pedestrian Traffic

■ Concerning pedestrian traffic, Felix's motion said, "Gary Helton admitted having actual knowledge of pedestrian activity two to three times per week within a quarter of a mile of the accident site, but knowingly operated his vehicle without looking ahead[.]" KCS asserts that by focusing in his motion on Helton's testimony concerning his actual knowledge of pedestrian traffic a quarter of a mile from the accident site, Felix waived his right to rely on broad categories of evidence to support his punitive damages claim. We agree. To preserve the issue for our review, Felix had to make a definite objection either at trial or in his motion for new trial. *Ingle,* 608 S.W.2d at 79. A party against whom a verdict is directed "is not to be permitted to broaden the scope of [his] objections beyond that made to the trial court, ... for a case cannot be pleaded and tried in the trial court on one theory and on a different theory in the court of appeals." *Plumlee v. Ramsay Dry Goods Company,* 451 S.W.2d 603, 605–06 (Mo.App.1970).

### 3. Speed Rule

■ KCS contends that we should not consider evidence of Helton's alleged violation of a KCS speed rule because Felix's petition did not plead a violation of any speed rule as a basis for punitive damages. A party must plead only ultimate facts in his petition. Evidentiary facts supporting ultimate facts are not requisites. *Scheibel v. Hillis,* 531 S.W.2d 285 (Mo. banc 1976). Helton's violation of an alleged KCS speed rule is merely an evidentiary fact supporting Felix's pleaded claim of willful and wanton conduct. Felix pleaded that Helton negligently failed to keep a careful lookout while operating the hy-rail and that KCS was liable for punitive damages because Helton's conduct showed complete indifference to, and a con-

scious disregard for, the safety of others. Felix pleaded the necessary ultimate facts in his petition for punitive damages. Felix preserved Helton's alleged violation of the speed rule to support his claim for punitive damages by specifically objecting in his motion for new trial to the trial court's granting the directed verdict in light of this evidence. *Ingle,* 608 S.W.2d at 79.

■ KCS further claims that Felix voluntarily withdrew any speed issue from the case at the time the case was submitted to the jury because the verdict-directing instruction which Felix tendered and which the court gave for Felix's ordinary negligence claim did not submit excessive speed as an issue. This argument is without merit because (1) a party is not required to submit evidentiary facts in his verdict-directing instruction, *McMullin v. Borgers,* 806 S.W.2d 724, 730 (Mo.App.1991), and (2) additional facts relating solely to a plaintiff's punitive damages claim need not be included in his ordinary negligence submission. *Menaugh v. Resler Optometry, Inc.,* 799 S.W.2d 71, 74 (Mo. banc 1990).

### E. Whether Felix Made a Submissible Case

■ Felix asserts that he made a submissible case for punitive damages because he established that Helton knowingly violated KCS rules requiring him to keep a constant lookout and requiring him to drive at a speed which would allow him to stop for obstructions, and that Helton knew his violation presented a high probability of injury. To recover punitive damages, a plaintiff must establish facts in addition to those relied on for the underlying negligence action. "Ordinarily punitive damages are not recoverable in an action for negligence because negligence, an omission of the duty to exercise care, is the antithesis of willful or intentional conduct." *May v. AOG Holding Corporation,* 810 S.W.2d 655, 661 (Mo.App.1991).

■ The law, however, will infer intentional conduct from a negligent act if it manifests reckless indifference to the rights of others. *Id.*

"[T]here may be conscious negligence tantamount to intentional wrongdoing, as where the person doing the act or failing to act must be conscious of his conduct, and, though having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions that his conduct will naturally or probably result in injury[.]"

*Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc./Special Products, Inc.,* 700 S.W.2d 426, 435 (Mo. banc 1985) (citation and emphasis omitted). To justify punitive damages, the actor "must either know or have reason to know that his ... act is substantially likely to cause physical harm." *Id.* As stated by the Missouri Supreme Court in *Burnett v. Griffith,* 769 S.W.2d 780, 787 (Mo. banc 1989) (footnote omitted):

Justified as punishment and intended to make an example of a defendant on account of his outrageous conduct, punitive damages require a showing of a culpable mental state on the part of the defendant, either by a wanton, willful or outrageous act or reckless disregard (from which evil motive is inferred) for an act's consequences. "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or reckless indifference to the rights of others." Restatement (Second) of Torts, § 908(2) (1979). It is not so much the commission of the intentional tort as the conduct or motives—the defendant's state of mind—which prompted its commission that form the basis for a punitive damage award.... Plaintiff must prove that defendant's evil hand was guided by an evil mind.

■ Further, a violation of an industry custom or standard does not necessarily equate to a violation of a legal standard of care. "The duty of care is an objective standard determined by what an ordinary careful and prudent person would have done under the same or similar circumstances." *Pierce v. Platte–Clay Electric Cooperative, Inc.,* 769 S.W.2d 769, 772 (Mo. banc 1989). Helton's knowing violations of KCS' rules do not in and of themselves establish a breach of his duty of care. It is a matter for the jury to decide whether an ordinary careful and prudent hy-rail driver would not have violated KCS' rules and whether the violations of the rules amounted to a reckless indifference to the rights of others and presented a high probability of injury.

■ Number 163 of KCS' Rules and Regulations for the Maintenance of Way and Signal Department provided, "Track car operators must approach persons, animals, equipment on adjacent tracks, etc., prepared to stop, and must keep a sharp lookout for all obstructions, especially in flangeways at grade crossings, guard rails, and frogs and for objects on the rail." On the day of the accident, Rule 163 applied to Helton's operation of the hy-rail. KCS' superintendent of rules testified that the rule required Helton to keep a sharp lookout at all times and to be prepared to stop for people or other obstructions on the track.

Helton admitted that when he hit Felix he was looking down and writing notes. He acknowledged in his deposition that he was not keeping a lookout for people although Rule 163 required him to do so. Although Helton later changed his testimony to say that the rule's reference to obstructions did not include people, the jury was entitled to consider Helton's deposition testimony and the subsequent changes. Further, Helton admitted at trial that he had violated Rule 163. Felix's attorney asked Helton:

Q: And you also agree that if you are keeping a sharp lookout for all obstructions, you would incidentally be looking out for people, too?

A: Yes.

. . . .

Q: So this rule [163] does require you to keep a lookout for people, does it not?

A: I don't know as far as all—just people itself.

Q: I understand that it's not limited to people but people are included in that rule, Mr. Helton, correct?

A: Yes.

Q. The rule requires you to keep a sharp lookout all the time, does it not?

A: Yes.

A jury could have found that Helton intentionally violated Rule 163 and determined that an ordinary careful and prudent hy-rail driver would not have done so under the same or similar circumstances.

Rule 138 provided that track cars, when occupying track limits within time granted, could move without flag protection at a restricted speed, which is defined as no more than 20 miles an hour. Rule 158, on the other hand, permitted automotive inspection vehicles to travel at 40 miles an hour or less "unless otherwise restricted." The jury could have reasonably concluded that the "unless otherwise restricted" phrase referred back to Rule 138's "restricted speed" limit of 20–miles–an–hour.

Smith initially testified in his deposition that Helton should have been operating the hy-rail at no more than 20 miles an hour. Smith later amended his deposition to say that Helton's speed limit was 40 miles per hour. He said that he changed his testimony after consulting with the head of the maintenance of way department and discovering that the rule had been amended orally. The oral amendment, he said, provided that if a track car was the only vehicle operating within the track and time limits within which it had been granted authority, the speed limit would be governed by Rule 158. If other traffic was within the track and time for which authority had been granted, the restricted speed limit of 20 miles per hour applied. The jury, however, was not required to give any weight to Smith's change in testimony because a "jury is the sole judge of the credibility of the witnesses and the weight and value of their testimony and may believe or disbelieve any portion of that testimony." *Schroeder*, 833 S.W.2d at 414.

Helton admitted that he was driving at 25 to 30 miles per hour. A jury could have found that the speed limit was 20 miles per hour, that Helton willfully exceeded the speed limit and that an ordinary careful and prudent hy-rail driver would not have exceeded the speed limit under the same or similar circumstances.

KCS contends that in addition to proving that Helton violated the rules, Felix had to prove that Helton knew or had reason to know that not keeping a careful lookout and speeding on the tracks would naturally or probably result in injury to another. KCS argues that because Helton did not admit knowing that pedestrians were frequently on the tracks in the precise area of the wreck, Felix did not meet his burden.

At trial, Helton admitted seeing people at the Turkey Creek trestle two to three times a week and less frequently in the winter. Once, he said, he saw a pedestrian north of Turkey Creek trestle walking toward the VFW crossing on the shoulder of the right-of-way. Helton acknowledged knowing of a trailer park and other residences near the tracks. He claimed, however, that he never saw anyone on or around the tracks in the precise accident area.

Viewing this evidence in the light most favorable to Felix, we conclude that it was sufficient to present a jury issue as to whether Helton acted with a conscious disregard or with complete indifference for the safety of others. An intentional violation of safety rules meant to provide safety to the public would meet the standard for punitive damages if an ordinary careful and prudent hy-rail driver would not have violated the safety rules and those violations created a high probability of injury. A jury could have concluded from the evidence proffered by Felix that Helton consciously disregarded the safety of others by looking down and not watching where he was going while speeding through an area he knew was populated.

## II. Public User Doctrine

KCS complains that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict because Felix failed to make a submissible "public user" case. We disagree.

### A. General Standards

Generally, a railroad has no duty to maintain a lookout for trespassers on its track. "If such persons are actually seen, the carrier must exercise due care to avoid injuring them; but until they are observed no duty arises." *Hamilton v. Kansas City*

*Southern Railway Company*, 250 Mo. 714, 720, 157 S.W. 622, 624 (1913).

 Missouri, however, recognizes an exception to this rule, the "public user" doctrine. If the railroad has actual or constructive notice of the public's habitual use of its tracks, the railroad must "exercise ordinary care to maintain a lookout for persons upon the track." *Coonce v. Missouri Pacific Railroad Company*, 358 S.W.2d 852, 854 (Mo. 1962). As stated in *Coonce:*

> [T]he railroad's knowledge of public user is not generally established by direct evidence, "but must be inferred, if they exist, from other facts, as, for example, the long acquiescence of the company in the open, known, free, continuous, and extensive use of its tracks by the public as a footway."

*Id.* (citation omitted). In determining whether Felix presented sufficient evidence of public use, we must heed the directives of the Missouri Supreme Court in *Eppstein v. Missouri Pacific Railway Company*, 197 Mo. 720, 734, 94 S.W. 967, 971 (1906):

> In a given case there might be such scant or neutral evidence of public user of a portion of a track, mere sporadic instances thereof, that a court, as a matter of law, would determine that the ... railroad ... had no duty to look and see.... On the other hand, there might well be a case where the public user of a portion of the track by pedestrians was so constant, so pronounced, so manifest, and uncontradicted that there could be no two opinions about it among reasonable men, and the court, as a matter of law, might assume that locomotive operatives owed a duty to the public to be on the lookout there. Then, too, there might be a case lying between said extremes ... where the use by the public of the track was of such sort that it became a mixed question of law and fact whether those running a locomotive engine had reason to anticipate the presence of people, and in such a case that issue should be submitted to the jury, as a fact to be determined by it.

### B. Sufficiency of Felix's Evidence

The trial court restricted Felix's proof of public user to the limited area of tracks

between the Turkey Creek Trestle and the VFW crossing, a distance of less than one-half mile. Viewing the evidence in a light most favorable to Felix, we conclude that the evidence was sufficient to create a jury question as to whether the tracks in question were subject to the public user exception.

### 1. Evidence of Public Use

 The accident occurred in a populated area with a trailer park to the east and houses scattered about the area. Two witnesses testified that they had used footpaths and walked on the tracks in the accident area since they were children. Both testified that the public continued to use the path near the power lines and continued to walk the tracks between Turkey Creek trestle and the VFW crossing year-round. Teenagers verified the existence of footpaths crossing the tracks near the power lines, testifying that the paths had been there as long as they could remember. They verified their use of the path which they used to cross and gain access to the track multiple times each week. A witness testified that during the school year he used the path three or four times a week to walk to school. Another witness estimated that he used the path three to seven times a day year-round. Felix submitted photographs depicting a footpath at the accident site and footpaths around the trestle extending north toward the area of the wreck.

Several witnesses testified that when they walked along the tracks and the paths, they often saw others walking, too. Others said that they had seen people jogging on the tracks, walking the tracks from the trestle to VFW crossing or vice versa, riding horses and bikes along the tracks, and hunting on the tracks. A taxicab driver, who was in the area several times a day, said that she saw people walking on or along the tracks "most all of the time." Teenage girls who lived south of Turkey Creek said they walked to this area of the tracks. They had seen the footpaths in the area of the wreck and testified that every time they walked past the Turkey Creek trestle they would see people spread out in the area on the paths. They saw other people putting pennies on the

tracks north of the trestle and jogging and walking on the tracks.

■ Felix also presented sufficient evidence to establish KCS' actual or constructive knowledge that the public was habitually using its tracks. During the 1980s, KCS ran 6 to 14 trains a day through the area. More than 200 KCS employees regularly worked in the area. Helton admitted seeing people at Turkey Creek an average of two to three times a week during the summer and less frequently during the winter. A witness told the jury that trains and hy-rails had passed him in the exact area of the accident approximately 1500 times. Others said trains and hy-rails had passed them as they walked along the tracks between the trestle and VFW crossing. The witnesses testified that KCS personnel waved to them. One said a KCS trainman threw him a container of water as he walked along the tracks. Another said that during the winter he walked a footpath crossing the tracks within feet of the wreck three or four times a week, and, during the three months before the wreck, a hy-rail passed him while he was on or near the tracks using the path five or six times. Even if Felix had not presented evidence showing that KCS personnel saw the pedestrians, his evidence would have been sufficient to establish the requisite knowledge. A plaintiff can establish constructive knowledge of public use by showing the public's open and constant use of the tracks for a long time, and such evidence creates a presumption of the railroad's knowledge. *Counts v. Kansas City Southern Railway Company,* 340 S.W.2d 670, 674 (Mo.1960).

## 2. Specificity of the Evidence

■ KCS argues, however, that we must examine the evidence regarding the public use of the tracks in reference to the precise time and place where the accident occurred. KCS frames the issue as "whether Helton was under a duty to be looking out on Sunday morning, February 26, 1989, at the place where his vehicle struck [Felix]." KCS cites *Coonce,* 358 S.W.2d at 856 (quoting *Chamberlain v. Missouri Pacific Railway Company,* 133 Mo. 587, 598, 33 S.W. 437, 440 (1895)), for the proposition that a railroad's liability in a

public user case "must be answered by a reference to the time and place of the accident."

In *Coonce,* the accident occurred in an unpopulated area, and the court held that the evidence of public use during daylight hours did not place a duty on the railroad to keep a lookout for trespassers during the night. The court noted, however, that the " 'rule of waiver of the right to expect a clear track has always been applied to places of *limited extent* around which there is a considerable population in cities or towns[.]' " *Id.* at 858 (emphasis in the original) (quoting *English v. Wabash Railway Company,* 341 Mo. 550, 560, 108 S.W.2d 51, 57 (1937)). " 'User at a place where there is a very considerable population living adjacent to the tracks in a city ... is essentially different from user in open sparsely settled county [country] districts outside city limits.' " *Counts,* 340 S.W.2d at 674 (quoting *Cochran v. Thompson,* 347 Mo. 649, 656, 148 S.W.2d 532, 536 (1941)).

KCS also relies on *Frye v. St. Louis, I.M. and Southern Railway Company,* 200 Mo. 377, 98 S.W. 566 (1906), to support its contention that we must examine the evidence regarding the public use of the tracks in reference to the time when the accident occurred. In *Frye,* the Supreme Court limited the evidence of public use to a specific time of the day. However, in *Rice v. Jefferson City Bridge and Transit Company,* 216 S.W. 746, 752 (Mo.1919), the Supreme Court discussed its holding in *Frye* and declined to apply the rule in *Frye* for reasons applicable in this case:

Instruction 11 withdrew from the consideration of the jury all testimony as to the use of the track during the daytime. Evidently this was given on the theory that knowledge of nighttime use of the track would not be inferred from its daytime use. There is an intimation of this view in the *Frye* Case[.] But in the case at bar the evidence furnished no basis for such distinction[.] On the part of plaintiff it tended to show that a large number of pedestrians passed over the track at the place in question during both day and night[.]

The use that the evidence tended to establish, therefore, was that of pedestrians in passing over the track in going to and coming from the trains at North Jefferson without distinction as to whether in the daytime or at night, and the plaintiff was entitled to have the jury consider all the evidence having a bearing in that respect. For that reason this instruction should not have been given.

Hence, *Rice* stands for the proposition that evidence showing use at different times is competent to show continuous use over a long period of time. *Wilkerson v. Missouri Pacific Railroad Company*, 69 S.W.2d 299, 303 (Mo.App.1934). Contrary to KCS' argument, evidence of use of the tracks at different times of the day or year may be considered in deciding whether the plaintiff made a submissible case.

KCS asserts that only one witness testified about winter use of the path and this belies continuous and habitual use. We disagree. Our reading of the record reveals at least six witnesses whose testimony supported a finding that the public frequently used paths or walked on the tracks in and around the precise accident site during winter months or year-round. Other witnesses testified of frequent public use of the accident site without limiting the time-frame to the winter. Thus, even if we are required to examine the evidence regarding the public use of the tracks in reference to the time and place where the accident occurred, Felix presented sufficient evidence to prove habitual and continuous public use of the tracks at the area of the power line path during the winter.

Because Felix presented sufficient evidence of habitual and continuous use of the tracks in the area where the accident occurred in all seasons, evidence of summer use should not have been withdrawn from the jury's consideration as KCS contends. *See Rice*, 216 S.W. at 752.

 Our conclusion is consistent with *Counts*, 340 S.W.2d at 675, in which the Supreme Court of Missouri concluded that the evidence in that case was sufficient to warrant submission of the public use doctrine. In *Counts*, the plaintiff was injured on a spur track near the railroad's main tracks in Joplin. The factors considered by the court in submitting the doctrine were:

that many dwellings were close by;

the absence of a fence around the area or any efforts to restrict its use by the public;

a well-defined path which crossed the tracks;

evidence of children playing in the area;

evidence of women picking greens between the tracks year-round;

pedestrian's frequent use of the railroad's main line at all times of the day;

evidence that for years children had picked up scrap dropped by railroad cars;

a visible pathway along each side of the spur track; and

a witness' testimony that he saw many people walking along the tracks every day, another witness' testimony that he had walked up and down the spur, and a third witness' testimony that he had walked on both the main line and the spur.

Felix presented at least as much evidence. His evidence showed that the collision occurred in a populated area with nearby residences. KCS had put up no fences or signs to ward off public use of the tracks where the accident occurred. Pedestrians had used visible paths in the area for many years. Several witnesses testified to using a path where the accident occurred.

Felix made a submissible public user case. It was a question of fact for the jury to decide whether that particular portion of the track was subject to the public user exception.

### 3. Type of Use

Finally, KCS argues that Felix's use of the tracks was not consistent with the evidence of public user shown by his evidence. We disagree. At least one of the witnesses testified of seeing others putting pennies on the tracks. Nonetheless, KCS did not raise the argument in its motion for directed verdict or for judgment notwithstanding the verdict; therefore, the argument was not preserved for review because it was never presented to the trial court. *See Stogsdill v. General*

*American Life Insurance Company,* 541 S.W.2d 696, 699–700 (Mo.App.1976).

## C. The Instruction

KCS argues in the alternative that even if Felix presented sufficient evidence to make a submissible public user case, the trial court erred in giving Felix's verdict-directing instruction on the issue. The instruction provided:

> In your verdict you must assess a percentage of fault to [KCS], whether or not [Felix] was partly at fault, if you believe:
>
> First, pedestrians openly and habitually used the railroad tracks in the area where the collision occurred, and
>
> Second, [KCS] knew, or by using ordinary care should have known, of such use, and
>
> Third, driver Helton failed to keep a careful lookout for pedestrians on the railroad tracks, and
>
> Fourth, driver Helton was thereby negligent, and
>
> Fifth, such negligence directly caused or directly contributed to cause damage to [Felix].

KCS argues that the instruction was a "classic 'roving commission' instruction" and did not submit the required findings necessary to support a verdict for Felix.

■■■ A verdict-directing instruction is erroneous if any finding is contrary to law or is not supported by the evidence. In reviewing the instruction, we must be able to conclude, to a legal certainty, that liability ensues if the jury makes the findings detailed in the instruction. *Dwyer, Costello and Knox, P.C. v. Diak,* 846 S.W.2d 742, 747 (Mo.App.1993). Missouri Approved Jury Instructions (MAI) has no instruction for public user cases. The test of a not-in-MAI instruction is whether it can be readily understood by the jury and whether it follows the substantive law by submitting the ultimate facts required to sustain a verdict. *Karnes v. Ray,* 809 S.W.2d 738, 740 (Mo.App.1991).

## 1. Definition of "Area"

■■■ KCS complains that the instruction did not define "area." We agree with KCS that the instruction needed to restrict the area of public use to the point where the accident occurred. In *Hufft v. St. Louis & San Francisco Railway Company,* 222 Mo. 286, 301, 121 S.W. 120, 124 (1909), the Supreme Court of Missouri said that an instruction in a public user case must put to the jury "the question as to whether or not the track *at the point of injury* had been so long and continuously used by the public was a footpath as to indicate knowledge and acquiescence therein by the railway company[.]"[6] Further, liability in public user cases is:

> [A]lways predicated upon the main fact that the use of the railroad track *at that point* by the public had been of such a nature and character as to furnish a reasonable ground on the part of the operatives to expect or anticipate the presence of persons *at that particular point,* and, such being the case, it was made the duty of such operatives under the law, through its high regard for the preservation of human life, to keep a lookout for the persons whose presence was reasonably expected *at that particular point* on the line of railway.

*Ahnefeld v. Wabash Railway Company,* 212 Mo. 280, 302, 111 S.W. 95, 100 (1908) (emphasis added). *See also Wise v. Chicago, Rock Island and Pacific Railway Company,* 335 Mo. 1168, 1176, 76 S.W.2d 118, 122 (1934).

■■■ The instruction given to the jury in this case did not restrict the public use evidence to the particular point on the tracks where Felix was injured. This was prejudicial error, especially because KCS contested any notion that it had acquiesced to public use at the particular point where Felix was injured. The instruction gave the jury the option of concluding that KCS had not acquiesced to public use at the point where Felix was injured but still finding for Felix on the basis of public use at the Turkey Creek trestle, a quarter of a mile away. The instruction gave the jury too much leeway.

**6.** We added the emphasis.

## 2. "Knowledge"

▇▇ KCS also contends that the instruction's second paragraph was erroneous because the "knowledge" element understated Felix's burden of proof. KCS argues that the instruction did not follow MAI 22.01, the knowledge standard in a trespass case, and so it erroneously suggested to the jury that KCS had a duty to patrol and to inspect its right-of-way for the presence of pedestrian paths or activity.

MAI 22.01 requires a finding that "defendant knew or had information from which defendant, in the exercise of ordinary care, should have known." The instruction submitted hypothesized that KCS "knew, or by using ordinary care should have known." KCS is complaining that the instruction suggested that it had a duty to use ordinary care to find out that the public was using its tracks when, as MAI 22.01 suggests, it had a duty to act only upon information it already had.

▇▇ A railroad which has constructive notice of habitual public use of its tracks has a duty "to exercise ordinary care to maintain a lookout for persons upon the track[.]" *Coonce*, 358 S.W.2d at 854. "To constitute constructive notice of such user, the use must be open and constant over such period of time as to raise the presumption that it is known to the employees of the railway." *Counts*, 340 S.W.2d at 674.

▇▇ Felix was not obligated to show that the railroad had actual knowledge of public use or actual knowledge of facts which would reasonably cause it to conclude that such use was occurring. Evidence of open and constant public use for a long period created a presumption that KCS was aware of such use. *Id.* As stated in *Eppstein*, 94 S.W. at 971:

> Liability in each instance is predicated of knowledge or notice of the user. Such notice may be proved by the existence of paths well worn by human feet, and by gaps, stiles, and gates appurtenant to such

path, by long continued going to and fro of people more or less constantly, and by the proved presence of schools, places of recreation, etc., and the use of the track by visiting pedestrians and habitues[.]

The paths served as a warning to KCS that persons were in the habit of trespassing on its tracks at that point. *Wise*, 76 S.W.2d at 122.

KCS cites to no public user case which has used the knowledge element in MAI 22.01, and the public use case law we have found seems to suggest the contrary. A well worn path used by individuals constantly is enough to put the railroad on notice of public use.

## 3. Felix's Rebuttal

▇▇ Felix argues that even if the instruction was erroneous, KCS was not prejudiced because it imposed on itself the duty of keeping a lookout for pedestrians by adopting Maintenance of Way Rule 163 [7] and was obligated anyway to keep a lookout because it laid its tracks alongside publicly-traveled roads. Felix contends that he assumed an unnecessary burden in his verdict-directing instruction by not relying on these factors, and so KCS was not prejudiced.

Felix's argument is not persuasive; we cannot be as certain as he suggests which burden was lighter. Both issues—whether the public was using the tracks habitually or whether the rules obligated KCS to keep a careful lookout—were matters of evidence to be determined by the jury. We have no basis for concluding whether Felix would have had an easier time convincing the jury under an instruction hypothesizing the rules as opposed to public use.[8] Moreover, his assertion is disingenuous given his emphasis at trial, through the presentation of numerous witnesses, of public use.

## III. Negligence Per Se

▇▇ KCS contends the trial court erred in refusing to give its instruction on negligence *per se* because, pursuant to § 389.-

7. See the rule at page 729, supra.

8. Although he claims on appeal that the trial court's refusal of his verdict-directing instruction

was error, he did not preserve the issue in his cross-appeal. We, therefore, do not concern ourselves with the issue.

650.6, RSMo 1986, Felix's trespass rendered him guilty of negligence *per se.* KCS wanted the trial court to instruct the jury that it *had* to assign some percentage of fault to Felix for his negligence of standing or walking upon the tracks because he was a trespasser pursuant to the statute. In the instruction given, the jury was *permitted* to assign a percentage of fault to Felix for his conduct in walking or standing on the track, but only if the jury believed that such conduct was negligent.

■ To submit a negligence *per se* instruction, "there must in fact be a violation" of the statute upon which the instruction is based. *Sayers v. Haushalter,* 493 S.W.2d 406, 409 (Mo.App.1973). If no violation is shown, refusal of a negligence *per se* instruction is proper. *See Monteer v. Prospectors Lounge, Inc.,* 821 S.W.2d 898, 901 (Mo.App. 1992).

The instruction said:

In your verdict you must assess a percentage of fault to [Felix], whether or not [KCS] was partly at fault, if you believe:

First, either:

[Felix] walked or stood upon [KCS'] railroad track, or

[Felix] failed to keep a careful lookout for railroad traffic, and

Second, [Felix] in any one or more of the respects submitted in Paragraph First, was thereby negligent, and

Third, such negligence of [Felix] directly caused or directly contributed to cause any damage [he] may have sustained.

Although the jury assessed 15 percent fault to Felix, KCS argues that it is impossible to determine whether the jury found Felix guilty of negligence for standing on the tracks as required by § 389.650.6. KCS contends that under the instruction given, the jury could have concluded that Felix was not guilty of negligence for standing on the tracks, but was guilty of negligence for not keeping a lookout.

Section 389.650.6 provides:

If any person not connected with or employed upon the railroad shall walk upon the track or tracks thereof, except where the same shall be laid across or along a publicly traveled road or street, or at any crossing, as herein provided, and shall receive harm on account thereof, such person shall be deemed to have committed a trespass in so walking upon said track in any action brought by him on account of such harm against the corporation owning such railroad, but not otherwise.

This statute is virtually identical to the statute construed in *Ahnefeld,* 111 S.W. at 97.[9] In that case, the court rejected the railroad's argument that the statute required that the decedent be conclusively presumed or deemed to have committed a trespass in walking on the track:

In our opinion the right to invoke the provisions of this statute must be determined by the facts and circumstances surrounding the particular case. In other words, we are unwilling to say that this statute is absolute and furnishes a conclusive presumption that persons who go upon a line of road at such points as are designated by the statute are conclusively presumed to be guilty of trespass, and that no state of facts can serve to qualify the right of a railway company to invoke the provisions of that statute in defense of actions brought by persons who have been injured upon its line of road.

. . . .

[W]e have no hesitancy in holding that if the railway company at any particular point along the line of its road consented and acquiesced in the use of its track by the general public, and permitted the open, known, free, continuous, and extensive use thereof by footmen, such conduct on the part of the railway company can be and should be ... construed as amounting to

**9.** Section 1105, RSMo 1899, at issue in Ahnefeld provided, "If any person not connected with or employed upon the railroad shall walk upon the track or tracks thereof except where the same shall be laid across or along a publicly traveled road or street, or at any crossing, as hereinbefore provided, and shall receive harm on account thereof, such person shall be deemed to have committed a trespass in so walking upon said track in any action brought by him on account of such harm, against the corporation owning such railroad, but not otherwise."

an invitation by the railway company to use such track as a passway, and such conduct upon the part of such company should be held as a qualification of the right of the company to invoke the provisions of the section of the statute heretofore referred to in an action by a person for injuries received by reason of the negligence of the operatives of the railway in failing to keep a proper lookout for the presence of such person who is upon the track of the railway by reason of its conduct in consenting and acquiescing in the free, continuous, and extensive use of such track as a passway.... [I]t is not in harmony with sound legal principles to invite and acquiesce in the commission of a trespass, and then say to persons: "Notwithstanding we have for years invited you and consented to your presence upon our tracks at certain points, we owe you no duty, and you must look out for yourselves, and, notwithstanding you are here by our invitation and with our consent, you will be held amendable as common trespassers."

*Id.* at 101. Further, in *Le May v. Missouri Pacific Railway Company,* 105 Mo. 361, 370–71, 16 S.W. 1049, 1052 (1891), the Supreme Court construed a similar trespass statute and said, "If the deceased and others had for a long space of time, by the tacit permission of the defendant company, been accustomed to use the track of defendant's road ..., then he was not a trespasser within the meaning of the statute[.]" *See also Beard v. Missouri Pacific Railway Company,* 272 Mo. 142, 197 S.W. 907 (1917).

We conclude that the trial court properly refused KCS' negligence *per se* instruction. A person walking or standing on railroad tracks in an area subject to public use is not a trespasser within the meaning of § 389.-650.6.

The trial court's instruction submitted the issue to the jury to assess whether Felix's conduct of walking or standing on the tracks caused or contributed to his injuries. Because the jury was not required to assess a percentage of fault to Felix if it found that Felix was in an area of public use, we find KCS' contentions without merit.

## IV. Felix's Convictions

■ KCS alleges that the trial court erred in excluding from evidence Felix's 28 Arkansas convictions.[10] KCS argues that those convictions were admissible as a matter of right, pursuant to § 491.050, RSMo 1986, to impeach Felix's credibility. The statute provides:

> Any person who has been convicted of a crime is, notwithstanding, a competent witness; however, any prior criminal convictions may be proved to affect his credibility in a civil or criminal case and, further, any prior pleas of guilty, pleas of nolo contendere, and findings of guilty may be proved to affect his credibility in a criminal case. Such proof may be either by the record or by his own cross-examination, upon which he must answer any question relevant to that inquiry, and the party cross-examining shall not be concluded by his answer.

"Crime," as used in § 491.050, does not include municipal ordinance violations, and a party cannot impeach a witness with a municipal ordinance violation. *Willis v. Wabash Railroad Company,* 284 S.W.2d 503, 512 (Mo.1955); *Hollingsworth v. Quick,* 770 S.W.2d 291, 294–95 (Mo.App.1989).

■ Felix contends that the convictions were municipal ordinance violations, and were not admissible to impeach his credibility. We agree that the convictions were not admissible because KCS failed to lay an adequate foundation for their admission. To establish a sufficient foundation for an offer of proof, the offer must "state facts which are specific and sufficient in detail to establish admissibility[.]" *State v. Clay,* 763 S.W.2d 265, 270 (Mo.App.1988). The offer must show all facts necessary to establish admissibility, and admissibility cannot be established based upon the offering counsel's opinion.

10. *After voir dire and before opening statements,* the trial court sustained Felix's motion in limine to exclude the convictions. KCS filed a motion to reconsider this ruling before Felix testified. The trial court denied the motion to reconsider and treated the motion as an offer of proof so KCS did not need to offer the convictions as a part of its case. KCS renewed its offer of proof at the conclusion of all the evidence, and the trial court denied it again.

*Hawkins v. Whittenberg*, 587 S.W.2d 358, 363 (Mo.App.1979). Whether a sufficient foundation for admission of evidence has been laid is within the trial court's sound discretion. *Hayes v. Hudson Foods, Inc.*, 818 S.W.2d 296, 301 (Mo.App.1991). We review a trial court's ruling based on the facts as they appeared at the time the evidence was offered. *Drake v. Kansas City Public Service Company*, 333 Mo. 520, 531, 63 S.W.2d 75, 80 (1933). If we find the trial court's ruling was correct for any reason, we must uphold it. *Missouri Farmers' Association v. Kempker*, 726 S.W.2d 723, 726 (Mo. banc 1987).

KCS contends that Felix was convicted of misdemeanors in violation of state law and not municipal ordinances. The face of the conviction transcripts, however, do not reveal whether they are municipal ordinance violations or state law violations. Although the "revised" transcript [11] refers to Arkansas statutes, this alone does not establish that they were state law violations.

■ A city is not prohibited from enacting an ordinance punishing an offense even though state law denominates the offense as a misdemeanor. *Meredith v. Whillock*, 173 Mo.App. 542, 158 S.W. 1061 (Mo.App.1913). Arkansas Code § 14–55–207 permits a city to adopt portions of the state criminal code as city ordinances. Fort Smith by municipal ordinance, § 14–1, adopted by reference all sections of the Arkansas criminal code, but the Fort Smith ordinance did not set forth each state misdemeanor law as a separate municipal ordinance.

Because we cannot discern from the face of the transcripts whether Felix violated state law or municipal ordinances, we find no error in the trial court's exclusion of them. On retrial, if KCS lays an adequate foundation in establishing that they are violations of state law, the convictions would be admissible.

## V. Life Care Plan Expert

■ KCS argues that the trial court erred in admitting into evidence, and later refusing to withdraw from evidence, the opinion testimony of Felix's life care plan expert,

Wilbur Swearingin. KCS contends that Swearingin was not qualified to render his opinion. It also asserts that no evidence supported the opinion that Felix would "need future attendant care at a cost of $1.8 million because he will become 'totally paraplegic' and 'wheelchair bound.'"

■ Whether Swearingin was qualified was within the trial court's discretion. As stated in *Hord v. Morgan*, 769 S.W.2d 443, 448 (Mo.App.1989):

Whether a witness's qualifications to state an opinion are sufficiently established rests largely in the discretion of the trial court and its ruling thereon will not be disturbed on appeal unless there is a clear showing of abuse.... If the witness has some qualification, the testimony should be permitted. Further, the extent of an expert's experience or training in a particular field goes to the weight of the testimony and does not render the testimony incompetent.

We do not find Swearingin's testimony to be incompetent. Any weaknesses in Swearingin's qualifications could have been brought to the jury's attention by KCS' cross-examination of Swearingin. We conclude that the trial court did not abuse its discretion in allowing Swearingin's testimony.

■ KCS complains that no doctor or other qualified medical expert opined that Felix would become a paraplegic or be confined to a wheelchair or that Felix's future care would total $1.8 million. "[F]uture damages in a personal injury action are not compensable unless reasonably certain to occur." *Bennett v. Mallinckrodt, Inc.*, 698 S.W.2d 854, 866 (Mo.App.1985), *cert. denied*, 476 U.S. 1176, 106 S.Ct. 2903, 90 L.Ed.2d 989 (1986). We agree that Felix's evidence lacked any support for Swearingin's opinions concerning these matters. We conclude that the opinions were prejudicial to KCS and should be excluded on retrial unless supported by substantial and competent evidence.

It is not enough for the doctor to testify to the possibility of a certain result; his testimony should show that it is reasonably

---

**11.** The first set of certified copies of the municipal court transcripts did not refer to the Arkan-

sas statutes. A deputy clerk in Fort Smith added the statute numbers after KCS requested it.

certain to follow the injury. Consequences which are contingent, speculative, or merely possible are not proper to be considered by the jury in ascertaining the damages, for it would be plainly unjust to compel one to pay damages for results that may or may not ensue and which are merely problematical.

*Hahn v. McDowell,* 349 S.W.2d 479, 482 (Mo. App.1961).

## VI. Felix's History of Alcohol and Drug Dependency

■ KCS argues the trial court erred in excluding from evidence Felix's alleged history of alcohol and drug dependency. KCS contends that such evidence was relevant to Felix's future life expectancy, future quality of life expectancy and to his ability to adhere to a treatment regimen necessary to recover from his physical injuries.

■ Admission or exclusion of evidence lies within the sound discretion of the trial court. We will not reverse a decision unless there is a substantial or glaring injustice. *State ex rel. Highway and Transportation Commission v. Pracht,* 801 S.W.2d 90, 93 (Mo.App.1990). Generally, evidence of a witness' or party's alcohol consumption habits may be excluded because of its prejudicial value. *See Doisy v. Edwards,* 398 S.W.2d 846, 849–50 (Mo.1966). Because KCS claims that Felix's alcohol and drug usage affected Felix's life expectancy and rehabilitation, before such evidence can be admitted, KCS must show the relationship between the evidence and Felix. *See Sampson v. Missouri Pacific Railroad Company,* 560 S.W.2d 573 (Mo. banc 1978). No medical testimony existed showing that Felix's prior alcohol and drug usage affected his life expectancy or rehabilitation. Dr. Abrams, Felix's physician and witness, testified that continued drug or alcohol abuse may have an adverse effect on life expectancy, future quality of life, and rehabilitation; however, he did not testify that it would have an adverse effect on *Felix's* life expectancy, quality of life, and rehabilitation. We conclude that the trial court properly excluded the evidence because there was no indication that Felix's dependency would affect his life expectancy or his rehabilitation.

■ KCS also contends that the evidence of Felix's prior drug and alcohol abuse was admissible because the testimony of Dr. Peichal, Felix's physiatrist and principal treating physician, gave the erroneous impression that Felix's post-accident problems with alcohol and drugs were attributable to his efforts to cope with pain as a result of the injuries sustained in the accident. Dr. Piechal testified:

[On May 30, 1991, a] significant note is that [Felix] stated he basically stopped drinking. At that point in time, he was having a problem with some alcohol consumption because of the muscle spasms, and he felt that the alcohol, which is a depressant, a muscle depressant, was able to help this. But because of that, we went to more Valium for a short period of time to control that, and then we began him on the taper program.

KCS contends that this testimony opened the door to its presenting evidence of his prior alcohol and drug abuse problems. We disagree. The trial court's exclusion of this evidence was not an abuse of its discretion.

## VII. Chart Concerning Pedestrian Usage of Tracks

■ KCS claims the trial court erred in admitting and not subsequently withdrawing a chart which summarized Felix's evidence of pedestrian use of the tracks between the VFW crossing and Turkey Creek trestle. KCS contends that the chart was inaccurate, gave a false impression of the extent of pedestrian use of the tracks, and failed to confine itself to the relevant time and place.

Before trial, Felix took several videotaped depositions of witnesses who testified about their personal use of the tracks and their observations of public travel on the track between the crossing and the trestle. During the depositions, Felix's counsel filled out the chart reflecting the witnesses' testimony. He labeled four columns on the chart: "Name," "Frequency," "Passed By Train or HyRail," and "Warnings Given." Each witness confirmed the accuracy of the information on the chart during the deposition. The

trial court permitted Felix to use the chart during opening statement.

During trial, three of the witnesses on the chart testified. Felix's counsel used the chart and affirmed its accuracy as it related to each witness' testimony. The trial court ruled, however, that the chart did not accurately reflect Donald Williams' testimony. The court ordered the exhibit withdrawn unless the inaccuracy was corrected. Felix did not use the chart anymore, and the jury did not see it again. Although the trial court agreed with KCS that the chart was inaccurate, the court refused to give KCS' withdrawal instruction because it was overly broad.

■ It was KCS' duty to offer a proper withdrawal instruction. *State ex rel. State Highway Commission v. Blue Ridge Baptist Temple, Inc.*, 591 S.W.2d 248, 251 (Mo.App. 1979). "The giving of a withdrawal instruction rests within the sound discretion of the trial court and absent an abuse of such discretion, refusal to give a withdrawal instruction constitutes no basis for complaint." *Parker v. Pine*, 617 S.W.2d 536, 542 (Mo. App.1981). If the withdrawal instruction "affects the facts of the specification upon which liability may be justly predicated[,]" *Chastain v. Winton*, 347 Mo. 1211, 1221, 152 S.W.2d 165, 170 (1941), the instruction may not be given.

KCS' proposed withdrawal instruction instructed the jury to completely disregard the chart; however, the chart did contain information pertinent to Felix's submission under the public user doctrine. Hence, the trial court properly refused KCS' instruction. Because it was KCS' burden to tender a proper withdrawal instruction and because it did not, KCS' point is without merit.

### VIII. Children's Presence on the Tracks with Felix

■ KCS contends the trial court erred in admitting evidence regarding the presence of children on the right-of-way with Felix. KCS argues that such evidence was irrelevant and collateral to the issues in the case and allowed Felix to present "emotion-packed" testimony designed to arouse the sympathies of the jury. We disagree.

Stevie Joe Manis, age 4, was killed in the same accident in which Felix was injured. KCS filed a motion in limine to exclude mention of the death or presence of the children at the scene of the accident. Although the court went to great efforts to insure that the child's death was not brought before the jury, the court allowed evidence regarding the presence of the children at the scene. Prior to opening statement, the court instructed Felix's counsel to inform the jury that the children would not testify because they were young and had no memory of the accident.

■ Relevant evidence is evidence which tends to prove or disprove a fact at issue. *Lawson v. Schumacher & Blum Chevrolet, Inc.*, 687 S.W.2d 947, 951 (Mo.App. 1985). The children's presence had a bearing on facts of consequence. Under the public user doctrine the purpose for which a person is on the tracks is relevant. The children's presence was relevant to show why Felix was on the track and what he was doing at the time he was struck. Further, KCS claimed that Felix was contributorily negligent for failing to look and listen for approaching railroad traffic. Because children were present and because Stevie Joe Manis was crying because he could not find his penny at the time Felix was struck, the evidence is relevant to Felix's contributory negligence. Hence, we conclude the trial court did not err in allowing evidence of the children's presence at the scene, and it did not inflame the jury and prejudice KCS' case.

### IX. Can of Beer on Tracks

■ KCS complains that the trial court erred in excluding evidence that a can half full of beer was on the tracks at the scene of the accident. KCS reasons that if the trial court allowed the evidence regarding the presence of children on the right-of-way because it was part of the accident scene, it should have allowed evidence regarding the beer because it, too, was part of the accident scene.

The can was about 50 feet north of the accident site, sitting on a railroad tie between

the two rails of the track. When it was found immediately after the accident, it was still cold and had condensation on it. The trial court refused the evidence on the ground that it was "totally irrelevant."

KCS argues that "[t]o disallow the photograph of the can or mention of it on the basis that Felix denied that it was his and because of an absence of proof that Felix was under the influence is a matter which goes to the weight of the evidence, not its admissibility." The trial court did not abuse its discretion in excluding this evidence. No evidence existed linking Felix to the can of beer; nor did Felix's medical records or blood tests reveal that Felix had been drinking that morning.

### X. Felix's Lost Earnings Claims

██ Finally, KCS complains that the trial court erred in refusing to give a withdrawal instruction pertaining to Felix's dropping his lost earnings claims. We disagree.

"Where there is evidence in the case which might raise a false issue, it is reversible error for the trial court to fail to give an instruction withdrawing such evidence from the jury's consideration." *Harris v. Washington*, 654 S.W.2d 303, 307 (Mo.App.1983). However, no instruction was necessary in this case because there was no false issue about wage loss claims raised during this trial.

Throughout the trial the jury was informed that Felix's claims were for past and future medical bills, physical pain and suffering, and loss of enjoyment of life. The court and the parties informed the jury on numerous occasions that Felix was not making a claim for lost wages. Felix told the jury, "Ladies and gentlemen, so you won't be mislead in any way. There is no claim in this case for lost wages or lost earning capacity by the plaintiff. [W]e are not claiming, and there is no claim he is unable to do work. That's not a part of this lawsuit."

██ The decision whether to give a withdrawal instruction rests within the sound discretion of the trial court. *Parker*, 617 S.W.2d at 542–543. Based upon the repeated references to the jury that Felix was not making a wage loss claim, we find that the trial court did not abuse its discretion in refusing to give the withdrawal instruction.

### XI. Conclusion

We conclude that Felix made a submissible case on punitive damages, and the trial court erred in directing a verdict against Felix on his punitive damages claim. We also conclude that the trial court erred in submitting the verdict-directing instruction because it failed to restrict the public use evidence to the particular point on the tracks where Felix was injured. Hence, we reverse the judgment of the trial court and remand for a new trial. Because we are remanding for a new trial, it is not necessary to address KCS' additional points relied on alleging that the trial court erred in denying its motion for new trial and in awarding prejudgment interest.

All concur.